JENNIE–O FOODS, INC.

v.

The UNITED STATES.

No. 236–76.

United States Court of Claims.

June 14, 1978.

Robert M. Wattson, Minneapolis, Minn., for plaintiff.

Arlene Fine, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's request for review by the court of the recommended decision of Trial Judge Rob-

ert J. Yock, filed October 4, 1977, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. It is therefore concluded that plaintiff is not entitled to recover. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE [*]

YOCK, Trial Judge: This contract action involves an appeal from a decision of the Department of Agriculture Board of Contract Appeals (hereinafter the Board).[1] That decision affirmed the contracting officer's assessment of $33,835.10 in liquidated damages after plaintiff failed to make timely deliveries of a large number of processed turkeys in accordance with three supply contracts executed under a U.S. Department of Agriculture commodity support and domestic food consumption program. On cross-motions for summary judgment, the parties seek review of the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

Plaintiff argues that the Board decision was unsupported by substantial evidence and was incorrect as a matter of law in that (1) delays in shipments were beyond its control and without its fault or negligence, thus entitling it to an excusable delay, and (2) the contract's liquidated damage provision for late delivery was unenforceable because it constituted a penalty. Plaintiff waived oral hearing before the Board which decided the case based on the written documents and briefs presented by the parties.

For the reasons outlined herein, the Board's decision is affirmed.

### Facts

In July 1972, the U.S. Department of Agriculture (hereinafter USDA) issued Announcement PY–58 as a proposal for the purchase of turkeys. This announcement was in furtherance of the Government's purchase program pursuant to authority contained in section 32 of the Act of August 24, 1935, as amended (7 U.S.C. § 612c) designed in part to remove surplus turkeys from the market and in part to supply food to schools, hospitals and similar public institutions. The turkeys were to be purchased in one of three forms: individually packed, ready-to-cook whole turkeys called Commodity A; bulk-packed ready-to-cook whole turkeys, Commodity B; and cooked cut up and deboned turkey rolls, Commodity C. Purchase units were 70,000 pounds of ready-to-cook turkey; Commodity C was measured according to the yield from 70,000 pounds of whole turkey prior to cutting and deboning. Two delivery units of 35,000 pounds each equalled one purchase unit. PY–58 indicated that the Government would periodically issue invitations to offer that would specify the time for receipt of offers, times for making awards, delivery destinations, and shipping periods.

USDA issued invitations on a weekly basis between the July 1972 announcement and December 6, 1972, when buying was temporarily suspended, resuming again in March 1973. Plaintiff, a Minnesota poultry processor, responded to these weekly invitations, eventually entering into 13 separate supply contracts with USDA during the July 1972 through December 6, 1972 timeframe. During the same time period, USDA also contracted with three other Minnesota turkey processors.

Only three of plaintiff's contracts are at issue in this appeal. On August 23, 1972, USDA accepted plaintiff's offer of August

---

[*] The trial judge's recommended decision and conclusion of law are submitted pursuant to Rule 166(c). The necessary facts are stated in the opinion.

1. *Jennie-O Foods, Inc.,* AGBCA No. 375, 74–2 BCA ¶ 10,928.

21, 1972, made in response to USDA Invitation No. 5, for eight purchase units of Commodity C turkeys (Contract No. 12–25–3–4098). On September 27, 1972, USDA accepted plaintiff's September 25 offer made in response to USDA Invitation No. 10, for five purchase units of Commodity A birds and six of Commodity C (Contract No. 12–25–3–4227). On October 4, 1972, USDA agreed to plaintiff's October 2, 1972, offer made in response to USDA Invitation No. 11, for four purchase units of Commodity A turkeys (Contract No. 12–25–3–4248). Any Commodity C purchase was authorized an extension of the specified shipping period by 21 days. Although the contracts required Grade A turkeys, it did authorize the delivery of up to 30 percent Grade B birds at a discount of 3 cents per pound.

Article 38(c) of the Consumer and Marketing Service (C&MS) Purchase Document No. 1, Revision No. 1, of August 1969, which made up part of the contracts involved provided:

> Except for defaults of subcontractors, Contractor shall not be liable to USDA for damages sustained by reason of delay in performance or for any excess costs incurred by USDA in procuring elsewhere if the failure to perform arises out of causes beyond the control and without the fault or negligence of Contractor. * * * If the failure to perform is caused by default of a subcontractor and the default arises out of causes beyond the control of both the Contractor and subcontractor and without the fault or negligence of either of them, Contractor shall not be liable for damages sustained by USDA for such delay or for excess costs incurred by USDA in procuring elsewhere unless the supplies to be furnished by the subcontractor were obtainable by Contractor from other sources in sufficient time to permit Contractor to meet the required time of shipment or delivery.

Article 3(c) provides the appropriate definition:

> "Causes" as used in the phrase "causes beyond the control and without the fault or negligence" includes, but is not restricted to, acts of God or of the public enemy, acts of the Government (including priority or allocation orders), fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; however, in every case the failure to perform must be beyond the control and without the fault or negligence of the party to the contract seeking excuse from liability.

Finally, portions of Article 5 are pertinent to the resolution of the excusable delay issue:

> * * * Special care should be exercised in the preparation of offers. Offerers must make their own estimates of the facilities and difficulties attending the performance of the proposed contract, including local conditions, uncertainty of weather, availability of materials and containers, and all other contingencies. * * *

Plaintiff specified in each of the three offers that its shipping points would be its plants located in Willmar, Litchfield, or Melrose, Minnesota. But, as plaintiff conceded, only the Litchfield plant had the physical capacity to process the Commodity A individually packed whole turkeys while only the Willmar plant was properly equipped to process the Commodity C turkey rolls. Melrose was unequipped to perform any of the contract work.

Plaintiff was unable to achieve timely performance under any of the three contracts. Contract 4098 required shipment by October 21, 1972. On that date, plaintiff had delivered only 75 percent of the contract goods, final shipment not being completed until November 17, 1972. Under contract 4227, delivery of the Commodity A birds was required by November 15, the Commodity C birds by December 5, 1972. No shipments were made by either date and final delivery did not occur until March 1, 1973. Contract 4248 dictated delivery by November 15. Again, no shipments were made by November 15, with delivery finally being achieved on January 10, 1973. Despite the delays, complete performance un-

der all three contracts was eventually achieved.

Although the parties agree that plaintiff had initially subcontracted for sufficient supplies to fulfill its contractual commitments, plaintiff contends its problems in delivery arose once it began experiencing difficulties obtaining a sufficient supply of healthy turkeys from its chosen suppliers. Its two major suppliers were experiencing disease problems, which in some cases delayed delivery to plaintiff for processing, and in other cases resulted in considerable undergrading or condemnation at the time of processing. Plaintiff indicates this disease problem manifested itself to a serious extent by October 1, 1972. Consequently on October 16, 1972, plaintiff sent a telegram to the contracting officer requesting an unspecified time delay in delivery without liquidated damages to be assessed on contract 4098. The contracting officer responded by telegram dated October 20, 1972, by requesting documentation from a qualified source (veterinarian or poultry grader) as to the extent of the disease problem and the effect on plaintiff's operation. On November 7, 1972, plaintiff in turn responded by requesting a delay in delivery on contracts 4248 and 4227 (in addition apparently to 4098), of 6 weeks to December 29, 1972, without assessment of liquidated damages. Plaintiff indicated in its letter that the disease problem was a matter beyond its control which resulted in delivery delays and in processed birds being "improper in weight, high in condemnation and low in grade." In support of this request, plaintiff attached two letters from its principal suppliers which referred to the diseases of cholera and avian influenza in their turkey flocks with consequent disruption of delivery schedules and a high percentage of undergraded birds being delivered to plaintiff. Both letters were dated October 24, 1972, and were signed by the general managers of the turkey supply firms, both of whom were also veterinarians. One of the suppliers was EBO Farms, Inc., a subsidiary of the plaintiff, whose address in Willmar, Minnesota, and telephone number were identical to the plaintiff's. EBO supplied its entire output to the plaintiff, an amount that satisfied approximately 75–80 percent of plaintiff's total supply requirements. Their second supplier was Koronis Mill and Supply Co. of Paynesville, Minnesota. Koronis was to supply approximately 10–15 percent of plaintiff's supply. Plaintiff had contracted to purchase the remainder of its turkey needs from other unidentified suppliers.

By letter dated November 14, 1972, the contracting officer denied plaintiff's request for excusable delay and indicated that liquidated damages would be assessed on any shipments made beyond contract shipment dates. In making his decision, the contracting officer indicated he had investigated the matter and had found little evidence to support a finding of serious turkey disease in Minnesota. Specifically he noted that: (1) an unidentified poultry specialist at the University of Minnesota contended that the turkey disease problem in Minnesota was better in 1972 than normal, (2) trade publications and Government poultry sources had not noted any significant increase in turkey disease in Minnesota in 1972 and (3) no other processor in plaintiff's area had requested an extension of shipment period because of disease or any other supply problem.

By letter of November 29, 1972, plaintiff timely appealed the decision to the Secretary of Agriculture (i. e., the Board) pursuant to the contract's Disputes clause. The only new matter in the appeal letter was an attached letter from a University of Minnesota veterinary professor dated November 22, 1972, which indicated that he was aware of and worked on fowl cholera disease at EBO Farms during the July 11, 1972, through October 27, 1972, timeframe, that cholera at EBO Farms must have resulted in tremendous economic loss, and that cholera in Minnesota was up over 120 percent from the prior year (1971).

On January 9, 1973, plaintiff supplemented the appeal record by forwarding a letter that included a chart showing turkeys supplied to it from its three sources were running far below the normal rate of 80 per-

cent Grade A turkeys for the period September 2, 1972, through January 6, 1973. In addition, plaintiff mentioned in the letter and attached a chart showing that EBO Farms also had purchased diseased eggs from a hatchery, resulting in a Mycoplasma/Galliseptium (MG) disease problem. The letter further indicated that plaintiff was suffering a burden of loss that was substantial. Finally, the letter concluded with the following remarks:

> * * * We have been attempting to secure birds to replace those turkeys that are not suitable in a rising market. This has added to the loss which we are faced with; now estimated to approach over $200,000. We have an obligation to deliver the product at whatever cost and only ask that we be excused from liquidating damages to be assessed to our company.

Subsequent to this letter, plaintiff provided several other documents which were attached to its June 19, 1973 letter in reply to the defendant's answer in this case. Exhibit B was a chart which indicated that the Willmar processing plant received 75–80 percent of its supply of turkeys from EBO Farms during the months of October—December 1972, and that in November and December approximately 47 percent of those EBO-supplied turkeys were diseased to some degree. Exhibit C was a memorandum dated May 19, 1973, from the general manager of EBO Farms to Earl B. Olson detailing the extent of disease problems at EBO Farms during 1972. The memo claimed an increase in cholera at EBO Farms, up some 662 percent over 1971. In addition, the MG disease caused condemnation of turkeys for the months of November and December 1972 at the rate of 8.5 percent which was up from the normal 4.6 percent condemnation rate. Exhibit D was composed of two memorandums relating to the MG disease problem at EBO Farms. One of these memos indicated the MG disease problem on EBO Farms was discovered on or about September 12, 1972, when the eggs were hatched. Exhibit E was a letter signed by the two professors from the University of Minnesota veterinary department dated June 16, 1973 stating that the incidence of cholera at EBO Farms reached epidemic proportions during the fall of 1972. Exhibit G was a chart showing certain flocks by lot numbers which were scheduled for processing and delivery under contract 4227 by December 5, 1972, and which were apparently infected with MG disease resulting in considerable condemnation. Other exhibits submitted indicated the grades of the turkeys processed were running far below the 80 percent Grade A normal, processing line speed falloff at plaintiff's plant due to the undergrading, and shipment schedules. Plaintiff submitted no documentary evidence, hence there is nothing in the record, in support of its statement that it had attempted to obtain healthy turkeys from other suppliers in order to fulfill the contracts on time.

The Government, for its part, also submitted several documents to counter the plaintiff's claim. Exhibit 2 of the Government's answer of March 16, 1973 was a chart showing plaintiff's shipments during the period in question with notable falloff of shipments during November and December 1972. Exhibit 3 was a chart showing wholesale prices for turkeys from 1968–1973 indicating prices normally went up during the months of November-January. Exhibit 4 was a chart of plaintiff's processing record showing the number and percentage of turkeys slaughtered and condemned during the September 1972-January 1973 timeframe. The figures show a substantial increase in turkeys slaughtered in 1972 over the comparable figures in 1971 and the condemnation rate only slightly higher over the comparable period. Exhibit 5 is a chart showing plaintiff responding to at least 13 weekly USDA invitations to bid and receiving 13 contracts for delivery of processed turkeys during the July 24, 1972 through December 4, 1972, timeframe. Exhibit 6 is an extract from a trade publication article (TURKEY WORLD, November 1972) indicating very little incidence of turkey disease in Minnesota for 1972. Exhibit 7 was a chart showing that the trend in turkey processing was moving from processing whole turkeys (74 percent in 1967)

to processing cut up and deboned turkeys (52.3 percent vs. whole turkeys at 47.7 percent in 1972).

Both parties submitted documents (plaintiff's Exhibit A and defendant's Exhibit 1) showing liquidating damages assessed of $33,835.10 on the late shipments under the contracts.

The liquidating damage clauses of the contracts were contained in section XI of Announcement PY–58 of July 1972 and in Article 37(a) of C&MS Purchase Document No. 1 of August 1969. The PY–58 clause provided:

* * * Liquidated damages for late shipment in accordance with Article 37, C&MS Purchase Document No. 1, will be assessed at the rate of $.0007 per pound for each day of late shipment for Commodity A and B, and $.0007 per pound for each day of late shipment for Commodity C based on the weight of the whole carcass ready-to-cook turkeys from which Commodity C was produced. Notwithstanding any provision of Article 37 of C&MS Purchase Document No. 1, where USDA does not exercise its right of termination, liquidated damages shall be assessed for each day of delay (not excused under Article 38) continuing through the day of shipment.

The Article 37(a) clause in pertinent part provides:

The contract will provide for one or more deliveries to be made by a certain date or in accordance with a delivery schedule or will provide for one or more shipments to be made from point of origin by a certain date or in accordance with a shipping schedule. Delay in performance of such delivery or shipment will cause serious and substantial damages to USDA because of its urgent need for timely performance. Contractor shall be liable to USDA for liquidated damages at the daily rate set forth in the announcement. * * * If USDA does not exercise its right of termination under Article 38 of this Document, the amount of liquidated damages for any quantity for which there is delay shall be determined by multiplying the quantity times the daily rate times the sum of the calendar days commencing on the first day following the last day on which such quantity was required to be delivered or shipped under the contract and continuing through the day of delivery or shipment. In no event shall liquidated damages be imposed beyond 15 calendar days. Liquidated damages determined pursuant to this Article shall be the damages for delay in shipment or delivery referred to in Article 38 of this Document. The provisions of Article 38 of this Document excusing Contractor from liability shall excuse also the assessment of liquidated damages under this Article. Determinations as to whether causes for delay are beyond the control and without the fault or negligence of the Contractor and subcontractor shall be made by the contracting officer.

The Board issued its decision on November 8, 1974. It concluded that plaintiff's delays in shipments were not excusable and that the liquidated damages assessed did not constitute a penalty. The Board characterized the case as one involving economic hardship and not one of impossibility of performance.

It is the duty of this court to determine whether the Board's findings of fact and conclusions of law with regard to the two issues raised in this case were supported by substantial evidence and were correct as a matter of law.

*Excusable Delay Issue*

The Board made four findings regarding the excusable delay issue. First, it found that the plaintiff had sufficient turkey supplies on hand, and was obligated to arrange its processing time and space so as to complete its contracts on time. Second, it found that the undergrading and production time problems plaintiff encountered were due to the plaintiff's own limited facilities, diseased supplies, and allocation decisions. Third, it found the MG disease problem was one for the plaintiff's future, but not directly related to these contracts.

Fourth, it found the cholera and influenza disease problem to be a complicating factor for plaintiff, but not so sudden, catastrophic, or widespread as to represent more than an economic hardship factor. It concluded that all of the above factors were within the plaintiff's control and thus found against the plaintiff on this issue.

Plaintiff attacks all of the four findings above as being contrary to the facts and in error as a matter of law, but basically objects on two grounds. One, plaintiff objects to the Board's assumption underpinning all the above findings that plaintiff made no effort to obtain healthy turkeys on the open market. It asserts in this connection that the evidence before the Board is "overwhelming" that it did make efforts to get healthy turkeys. Two, plaintiff objects to the second implicit assumption that despite the contract language, it assumed the risk of epidemics (*i. e.,* turkey disease). It asserts in this connection that the epidemic that affected plaintiff's source of supply was entirely unforeseeable and of greater severity than the preceding year.

Defendant's position is that the facts as found by the Board are supported by substantial evidence, are correct as a matter of law and thus this court is bound by the decision. It specifically argues that this is a case of economic hardship (not one of impossibility), and the plaintiff has failed to sustain its burden of proof.

As earlier indicated, plaintiff's arguments do not prevail. Plaintiff does not prevail because this court agrees with the Board's characterization of this case as one of economic hardship and with its fourth finding which is the ultimate finding on this issue. Plaintiff simply did not do enough to obtain an adequate supply of healthy turkeys to meet its contractual obligations. Plaintiff does present facts that show economic hardship, but they do not show impossibility of performance.

■ One of the flaws in the plaintiff's presentation of this case, both in this court

and before the Board, is the apparent belief by plaintiff that it is dealing with a *per se* rule of law. That is, plaintiff throughout this case has pointed to the term "epidemics" contained in Article 3(c) of the contracts and sought to show that the turkey diseases reached epidemic proportions at its two suppliers' farms, as if this alone would excuse its nonperformance.[2] But Article 3(c) also has a "however" phrase which indicates that in order for plaintiff to take advantage of the excuse of epidemics or some other excusable delay factor, it must also be found that such excuse was beyond its control and without its fault or negligence. The Supreme Court has interpreted this phrase of a similar clause to mean that if plaintiff has an excuse enumerated in or within the meaning of the contract, it must go beyond merely proving the excuse. Plaintiff must also prove that it took all reasonable action to perform the contract notwithstanding the occurrence of the excuse. *United States v. Brooks-Calloway Co.,* 318 U.S. 120, 63 S.Ct. 474, 87 L.Ed. 653 (1943). Plaintiff's apparent misunderstanding of the law in this regard has caused its presentation to concentrate on side issues and not the ultimate one. If plaintiff were to succeed on this issue, it would have to allege and prove impossibility of performance. Plaintiff has failed to allege and argue it with conviction and plaintiff has certainly failed to bring forth sufficient evidence to prove it.

The Board held that plaintiff's problem in obtaining sufficient numbers of high grade turkeys to satisfy the delivery schedule was a case of economic hardship rather than legal impossibility of performance. The latter term, in its modern usage, is a "coat of many colors," encompassing much more than literal or actual impossibility. *Natus Corp. v. United States,* 371 F.2d 450, 455, 178 Ct.Cl. 1, 9 (1967). Within its scope is included performance that is excused because the attendant costs would be excessive and unreasonable, thus rendering performance so costly as to be impracticable. *Natus Corp., supra,* 371 F.2d at 455, 178

**2.** The court views the excuse which plaintiff attempts to prove as one of deprivation of raw materials, which, if proven serious enough, could form the basis for a valid excuse.

Ct.Cl. at 9; *see also Foster Wheeler Corp. v. United States,* 513 F.2d 588, 206 Ct.Cl. 533 (1975); *J. A. Maurer, Inc. v. United States,* 485 F.2d 588, 202 Ct.Cl. 813 (1973).

The commercial impracticability standard can be easily abused; thus this court has not applied it with frequency or enthusiasm. It is not invoked merely because costs have become more expensive than originally contemplated. *Natus Corp. v. United States, supra,* 371 F.2d at 458, 178 Ct.Cl. at 13; *Anthony P. Miller, Inc. v. United States,* 161 Ct.Cl. 455, *cert. denied,* 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). *See also Whitlock Corp. v. United States,* 159 F.Supp. 602, 606, 141 Ct.Cl. 758, 763, *cert. denied,* 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58 (1958); *Edwards v. United States,* 80 Ct.Cl. 118, 131 (1934).

There are other judicially imposed limits to the doctrine of commercial impracticability that suggest the Board was correct in labeling this case one of economic hardship. The doctrine may be utilized only when the promisor has exhausted all its alternatives, when in fact it is determined that all means of performance are commercially senseless. *Natus Corp. v. United States, supra,* 371 F.2d at 457, 178 Ct.Cl. at 11. There can be little sympathy for contractors who seek refuge behind the label of commercial senselessness (impracticability) without proof that they have made an effort to obtain performance in an alternative fashion. Thus, when a contractor complains that it is unable to obtain an adequate supply of a particular contractual commodity, it must show that the product was unavailable within the boundaries of a reasonable area in order to have a creditable excuse. *See Mitchell Canneries v. United States,* 77 F.Supp. 498, 111 Ct.Cl. 228 (1948), where the court excused performance after adverse weather destroyed the blackberry crop, preventing plaintiff from completing contract deliveries. Plaintiff sought unsuccessfully to locate a substitute crop within a 600-mile area. In excusing performance, the court noted:

It might be pointed out here that regardless of whether or not a contract provides for findings, there must be some reasonable limit to the area from which a contractor can be expected to acquire raw materials in performance of a contract. If the doctrine that a contractor may not be excused when materials are available anywhere, at any price, were carried to its logical conclusion, it would follow that there would have to be complete crop failure over the entire surface of the world before a contractor could be relieved from damages. If some small quantity of materials had been available in some distant country, a contractor could not be excused. * * * It would be an unconscionable result to hold the contractor liable for damages for failure to complete the contract when the raw material was actually unobtainable. [*Mitchell Canneries v. United States, supra,* 77 F.Supp. at 503, 111 Ct.Cl. at 250, 251.]

Such a set of facts contrasts sharply with the facts in this case. *See also Dillon v. United States,* 156 F.Supp. 719, 140 Ct.Cl. 508 (1957). The elimination or reduction of the contractor's own supply without proof of more widespread calamity, rendering performance truly senseless, will not suffice to excuse performance. A contractor's failure to exhaust alternative sources of performance highlights the difference between subjective impossibility (I cannot do X) and objective impossibility (X cannot be done). Only the latter is the basis for excusing performance. *See* Restatement (Second) of Contracts § 281, Comment e, Illustration 12 (Tent. Draft No. 9, 1974).

This court has insisted that the contractor has the burden of proof in establishing that it explored and exhausted alternatives before concluding performance was commercially senseless or impracticable. In *Clark Grave Vault Co. v. United States,* 371 F.2d 459, 461, 178 Ct.Cl. 52, 54 (1967), the court rejected plaintiff's plea for relief under an impossibility claim because the contractor had made no attempt to show that there was only one method by which to obtain performance, or that other methods would have been so costly as to bespeak commer-

cial senselessness. In *Koppers Co. v. United States*, 405 F.2d 554, 566, 186 Ct.Cl. 142, 162 (1968), the court again found for the Government because the plaintiff had failed to meet its burden of showing that performance could be achieved only at excessive and unreasonable cost:

> * * * It is not, we note, defendant's burden to prove that performance was possible or that a specific alternative was available to plaintiff whereby performance would be achieved.

■ When measured against these standards, the plaintiff has fallen far short of his burden in establishing a case of either actual impossibility or commercial impracticability. There is simply inadequate evidence in the record to suggest that the deprivation of materials was sufficiently widespread to preclude plaintiff from obtaining turkeys elsewhere than from its original suppliers. Plaintiff's letter from a University of Minnesota professor indicating an increase in the incidence of cholera (up 120 percent in Minnesota in 1972) does not carry plaintiff's burden of proof that the disease was so widespread, either in Minnesota or surrounding states, that plaintiff could not have procured turkeys elsewhere. The professor's suggestion that the disease must have created an economic hardship for EBO Farms likewise does not excuse the delays in delivery by plaintiff. None of the other documents plaintiff submitted to support its case related to the incidence of turkey disease in Minnesota and surrounding states, other than relating to the disease problems at its two suppliers' premises.

In contrast, defendant is able to point to a number of indications that the incidence of turkey disease was no higher in 1972 than in other years. For example, defendant submitted an extract of a trade publication which indicated little turkey disease increase in Minnesota in 1972. Also, defendant pointed out to the plaintiff that three other turkey processors in the state had delivered turkeys without delay under similar contracts with the USDA and had not reported disease problems with their sources of supply. The ability of other contractors to perform disputed work is persuasive evidence that the contract was not impossible to perform. *See Astro-Space Labs, Inc. v. United States*, 470 F.2d 1003, 200 Ct.Cl. 282 (1972). Perhaps even more important, however, is the fact that plaintiff itself conceded before the Board that its problems were unique to itself and its suppliers. Under such circumstances, a finding of objective impossibility or commercial impracticability would be totally unsupported.

■ Plaintiff's argument to the Board that obtaining substitute turkeys during the busy holiday season (October 1972 through January 1973) would impose a substantial economic hardship upon it does not change the above result. As already discussed, increased costs alone are not a basis for excusing performance. *See Natus v. United States, supra; Whitlock Corp. v. United States, supra.* But here again plaintiff offers no proof to support this assertion. In plaintiff's reply brief on appeal to this court, plaintiff asserts that the evidence before the Board overwhelmingly supports the plaintiff's assertion that it attempted to secure healthy turkeys in a rising holiday market. But there is no overwhelming evidence, in fact there is none. Plaintiff does not document these efforts, much as it did not document any evidence that substitute healthy turkeys were unavailable within a reasonable geographical area. Without such critical evidence, plaintiff has failed to carry its burden in establishing that performance was anything more than an unanticipated economic hardship. Plaintiff confronted a problem of supply, apparently unique to its source; such a unique supply problem was a risk plaintiff assumed to its ultimate detriment. This is precisely the risk Article 5 of the contracts speak to when it states:

> * * * Offerers must make their own estimates of the facilities and difficulties attending the performance of the proposed contract, including local conditions, * * * availability of materials and containers, and all other contingencies. * * *

·Having failed to perceive that the only way it could win on this issue was to prove actual impossibility or commercial impracticability, plaintiff argued to the Board that it did everything it could be expected to do to obtain delivery. Plaintiff's position in this respect is best summarized by its own words as contained in its June 19, 1973, answer to the defendant's brief filed with the Board:

> * * * All Jennie-O can be expected to do is to carefully and reasonably anticipate its needs, contract for its necessary sources of supply, reserve processing space in ample time for deliver, process the birds, and arrange for delivery of the contracted turkeys at the time necessary for processing. Jennie-O accomplished all of this.

Plaintiff then proceeded to argue and present proof to the Board that showed the turkey disease problems encountered by its suppliers resulting in delayed delivery in some cases and unhealthy turkeys delivered in other cases, were beyond its control, and unforeseeable to plaintiff. It further argued that the disease-related undergrading of the turkeys and production line slowdowns were beyond its control.

The Board for its part recognized that the ultimate point for plaintiff to prove on this issue was impossibility of performance (finding four) but indulged plaintiff's arguments by making findings on plaintiff's side issues. However, even these side issues (findings one, two and three) were found against the plaintiff.

■ In its first finding, the Board found plaintiff had sufficient supplies to fulfill the contracts. Although this finding is somewhat surprising, there is evidence in the record that one could base the finding on. The Board pointed to evidence indicating that between August 23, 1972 and December 5, 1972, plaintiff bid on and was awarded 11 contracts with USDA only three of which are in issue here). It also observed that Article 5 of the contracts required plaintiff to make its own estimates of the difficulties attending performance of the contracts and plan for the availability of materials. To this, one could add that plaintiff was on notice from July 11, 1972, that it had cholera problems at EBO Farms and from September 12, 1972, that it had MG disease problems at EBO. In the face of this, plaintiff offered no evidence that it attempted to line up other supplies to fill in the probable EBO supply gap. Plaintiff, of course, has insisted that initially it had sufficient supplies, but when it came time to deliver the processed supplies under the contracts, there simply were not enough healthy turkeys to process. It pointed to charts and other indications of disease which resulted in delays and condemnations. One finds implicit in the Board's finding the assumption that plaintiff utilized the healthy turkey supplies it had to fulfill other contracts—commercial and USDA. In any event, the finding is supported by substantial evidence and will therefore not be disturbed. Further, even if this court were to overturn the Board on this subissue, plaintiff still would not prevail on the ultimate issue.

■ In its second finding, the Board determined that the turkey grading and production line difficulties plaintiff encountered were that of allocation of resources closely tied to the peculiar plant and production techniques of the plaintiff's and thus within its control. It pointed to the evidence that plaintiff's plants actually processed more turkeys in 1972 than in 1971. Article 5 was again applied. To this, one might add the Government's sage observation that contract performance cannot be excused simply because a contractor's processing facilities cannot operate at maximum efficiency. In sum, there is substantial evidence to support this finding.

■ In its third finding, the Board determined that the MG disease problem was discovered on September 12, 1972, after certain turkey poults had hatched at EBO Farms. It observed that a normal turkey growth cycle would place most of infected poults beyond the contracts' delivery dates, and consequently, the MG disease problem did not directly relate to the contracts in issue. Further, on September 12, 1972,

when the MG disease was discovered, plaintiff had only one of the contested contracts to fulfill with USDA, yet it proceeded to contract with USDA for 10 more contracts. It concluded from the above, that this factor was within plaintiff's control. Plaintiff vigorously objects to this finding, stating that there was no evidence that the September 12 disease discovery memo was passed on by EBO Farms to plaintiff, thereby placing plaintiff on notice of the disease. One, however, simply cannot credit that argument in view of EBO Farms' subsidiary status to plaintiff, and the fact that EBO shared the same corporate office location and telephone number as the plaintiff. The evidence also supports this finding.

In summary, to prevail on the excusable delay issue involved in this case, the plaintiff had to prove that it was impossible for it to achieve timely performance under the contracts. This it failed to do and consequently it loses on this issue. Substantial evidence supports the Board's decision and there is no error as a matter of law.

### Liquidated Damages Issue

The Government's contracting officer, after making an investigation of the plaintiff's request for excusable delay, rejected the request and assessed liquidated damages pursuant to section XI of Announcement PY–58 of July 1972 and Article 37(a) of C&MS Purchase Document No. 1. The Board found that the assessment was supported by substantial evidence and was not arbitrary or capriciously assessed.

Plaintiff attacks the assessment of liquidated damages on the basis that the clause is unenforceable as constituting a penalty.

Liquidated damages, once looked upon with judicial disfavor, now are generally accepted as a legitimate technique to allocate the consequences of a breach before it occurs. The standards to be applied by courts in the United States have been supplied by the Supreme Court. In *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411–12, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947) the Court stated:

* * * When they [liquidated damages provisions] are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. * * * They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. * * And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract.

See also *Southwest Engineering Co. v. United States*, 341 F.2d 998, 1001–03 (8th Cir.), *cert. denied*, 382 U.S. 819, 86 S.Ct. 45, 15 L.Ed.2d 66 (1965). This court has insisted that these standards be met before enforcing liquidated damage clauses. *Young Associates, Inc. v. United States*, 471 F.2d 618, 621, 200 Ct.Cl. 438, 444 (1973). *See also, Higgs v. United States*, 546 F.2d 373, 212 Ct.Cl. 146 (1976); *Hughes Brothers, Inc. v. United States*, 134 F.Supp. 471, 133 Ct.Cl. 108 (1955).

Both parties cite to *Priebe, supra*, and *Southwest, supra*, as setting the standards for application in this case. They differ dramatically, however, in the application of these standards to the facts of this case.

Plaintiff in attacking the clause as a penalty argues basically three points. The first point is that USDA could have easily obtained substitute performance (other processed turkeys) and thus (in plaintiff's view) actual damages were easily ascertainable. Under such circumstances, plaintiff argues, a liquidated damage clause is unenforceable. The second point is that the damages actually assessed in this case bore no reasonable relationship to the probable damage which would result from a delay in performance. Plaintiff's third point is that Article 37(a) of the contracts set a 15-day limit to any liquidated damage assessment, and damages assessed beyond the 15 days as allowed by the later in time and more specific section XI of the PY–58 announcement therefore is unreasonable as setting no limit at all.

The defendant counters these arguments by asserting that plaintiff entered into the contract with full knowledge of the liquidated damages provisions and alternate termination rights of the Government, thus signifying its agreement that the amount fixed was a reasonable forecast of just compensation for harm caused by breach, and that the harm caused was difficult of accurate estimation at the time of contracting. It also argues that apart from this mutual agreement, the circumstances of this case show that the amount fixed was a reasonable forecast of just compensation and that the harm caused was difficult of accurate estimation. Further, plaintiff presented no evidence to the Board that would demonstrate the clause was intended as a penalty.

Plaintiff's first point is rather interesting. It is arguing that the Government had the right under the contracts to terminate and reprocure processed turkeys. If it did so, the damages would be readily and accurately ascertainable, thus the possible future damages were not difficult of accurate estimation. Plaintiff argues this in the face of its earlier assertion on the excusable delay issue that turkeys "are unavailable on immediate demand at the time of year involved in this Appeal." In other words, plaintiff says turkeys were unavailable to it, but not to the Government during the winter holiday season. The defendant could get turkeys but the plaintiff could not. Several comments are appropriate. One, the contract called for termination or assessment of liquidated damages for delay at the Government's option. Two, plaintiff had the duty of showing that turkeys were available to defendant and failed to do this. Three, plaintiff mistakenly assumes that the only damages appropriate are the difference between contract and current market price.

■ It has long been recognized that the Government's damages may consist of more than just the higher market price difference. Administrative expenses for instance may also be considered and they may be particularly difficult of accurate estimation. *See Young Associates, supra,* 471

F.2d at 621, 200 Ct.Cl. at 444, 445; *Hughes Brothers, Inc., supra,* 134 F.Supp. at 474, 133 Ct.Cl. at 113. Plaintiff's processed turkey deliveries were required pursuant to its undisputed contractual obligations under the USDA commodity support and domestic food consumption program. This program served two basic purposes. It performed the economic public policy function of price stabilization by removing turkeys from the market and it further provided a supply of turkeys to qualified schools, hospitals and similar public institutions. When plaintiff failed to make timely deliveries, the administrative and public policy costs to the Government may well have been greater than the possibly higher prices it may have had to pay if it had sought substitute performance on the open market. These costs are appropriately considered at contract time and are difficult if not impossible to estimate with any precision. The public's convenience and its interest in the expeditious administration of the domestic support program both may have suffered to an indeterminate degree after late delivery. Costs to the public convenience and the temporary thwarting of the public goals that the particular contract served are hard to measure with precision. Liquidated damage clauses are a means to avoid the problems associated with gauging these costs.

■ The plaintiff's second point needs very little discussion. In addition to foreclosing the possibility of more accurate estimation, these administrative and public policy costs suggest that a more reasonable forecast of potential damage at the time of contracting would have been difficult. Therefore, the provision of $.0007 per day per pound of processed turkey appears reasonable and satisfies the judicially mandated requirements. If plaintiff had evidence to the contrary, it should have come forward with it. There is no showing that the liquidated damages for delay provided for are beyond damages reasonably contemplated by the parties at the time of the contract. Where parties have by their contract agreed upon a liquidated damages clause as

414

a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced. *Southwest Engineering Co. v. United States, supra,* 341 F.2d at 1001–03.

It is interesting to note that a liquidated damages clause was upheld in a case involving the Government's milk support program. The court in that case adopted similar reasoning to that expressed in this case. *Weldon Farm Products, Inc. v. Commodity Credit Corp.,* 214 F.Supp. 678 (D.C.Minn. 1963). *See also, Weldon Farm Products, Inc.,* AGBCA No. 200, 70–2 BCA ¶ 8454.

The plaintiff's third point is that the liquidated damages clause allowing assessment without limit is inherently unreasonable. It pointed to the earlier in time and general Article 37(a) provision which set a 15-day maximum assessment of liquidated damages as indicating that even the USDA thought 15 days was the reasonable limit.[3]

 Merely because a liquidated damages clause does not contain a time limit has not caused this court great difficulty. The court has approved a liquidated damages clause that could have allowed assessed damages on a per day indefinite basis in *Hughes Brothers, Inc. v. United States, supra.* Although that case involved the Government in its role as a seller of surplus goods, such rates are no less appropriate when the Government is acting as a buyer faced with the implementation of a specific price support and food consumption program. In these circumstances, the Government has a duty to act within a reasonable length of time to preclude the contractor from having to pay a disproportionately high rate of damages. The court will simply look at the facts of the case to determine whether the liquidated damages actually assessed were reasonable under the circumstances. In this case the facts simply do not indicate that the liquidated damages

assessed were disproportionately high or that they were allowed to run an unreasonably long time.

In the final analysis, the contractor has the burden of showing that the contested liquidated damages bear no reasonable relation to the probable loss that the Government was likely to have suffered from a delay in performance. Plaintiff has failed to satisfy that burden. In view of this failure of proof and of the difficulty of estimating the public policy and administrative damages that were a consequence of plaintiff's late delivery, the contractual liquidated damage rate was enforceable and the assessment of liquidated damages by the Board is affirmed.

Substantial evidence supports the Board's determination on this issue and there is no error as a matter of law.

CONCLUSION

For the reasons outlined above, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

**3.** It is somewhat unclear whether plaintiff is also arguing the possible conflict between the two liquidating damages provisions in the contracts. To the extent that it is, however, the law is simply that the specific provision prevails over the general provision. *United Pacific Ins. Co. v. United States,* 497 F.2d 1402, 1406,

204 Ct.Cl. 686, 694 (1974); *Morrison Knudsen Co. v. United States,* 397 F.2d 826, 184 Ct.Cl. 661 (1968); Williston on Contracts § 619, at 743 (3d ed.). Further, the plain meaning of the words of section XI of the PY–58 clear up any potential conflict with Article 37(a).