JMNI, INC.

v.

**The UNITED STATES.**

No. 222–81C.

United States Claims Court.

Jan. 9, 1984.

---

Robert L. O'Halloran, Portland, Or., attorney of record for plaintiff. Joseph A. Yazbeck, Jr., Portland, Or., of counsel.

Alexander Younger, Washington, D.C., with whom were Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., and Glenn E. Harris, New York City, for defendant.

## OPINION

WOOD, Judge:

In this action, before the court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (Supp. V 1981), plaintiff sues to recover moneys claimed to be due under a tree-planting contract awarded to it by the Bureau of Land Management (BLM), Department of the Interior, December 20, 1979. The case has been fully tried and briefed, and is now ready for decision, on both liability and damages.

### Background

Plaintiff's contract (Contract No. YA–554–CTO–83, "the contract"), called for the hand planting of seedlings on approximately 643 acres of federal land in the Loon Lake Resource Area of the Coos Bay District, BLM, Coos Bay, Oregon. The contract included three separate "items," each covering a substantial amount of acreage, and included some 25 separate planting units of varying acreage.[1] The smallest and the largest planting units contained, respectively, 3 and 51 acres.

Following inspection and analysis of work on an individual planting unit, a "payment adjustment factor" (PAF), expressed in terms of a percentage, was to be computed for that planting unit.[2] The contract provided that if the PAF for a particular planting unit were found to be 2 percent or less, "100% payment" for that unit would be made. Where the PAF for a particular unit "is from 3% to 15%," "this will be the percent equitable adjustment to be deducted from the bid price for planting the unit." Where, however, the PAF for a particular planting unit "is greater than 15%, *no* payment will be made for the unit." (emphasis supplied).

Following the completion of contract performance, the BLM determined that PAF reductions in the contract bid price totaling

---

1. Plaintiff submitted a separate bid price per acre on each of the three items. Item 1a covered "Douglas fir 2–1." Item 1b covered "Douglas fir 2–0." Item 1c covered "Douglas fir 1–0." A "2–1" Douglas fir (*e.g.*) has been in a planting bed for two years, and in a transplant bed for one year.

2. The PAF will be explained in some detail hereinafter.

$26,085.44 were appropriate. For each of 7 planting units, which covered 184 acres, a PAF determination of more than 15 percent was made. Consequently, no payment whatever was made to plaintiff for planting those units.[3] A PAF determination of between 3 and 15 percent was made with respect to each of 17 other planting units, and deductions from the bid price, computed in accordance with the payment provision described above and amounting to $6,101.44, were also made for those 17 planting units. For one planting unit, "100% payment" was made.

Plaintiff advances two basic claims. The first is that so much of the contract payment clause as provided for no payment for any planting unit in which the PAF was found to exceed 15 percent is unenforceable as a penalty. The second is that plaintiff was paid less than it should have been under the contract in consequence of belated BLM inspections, because the belated inspections (a) caused more trees to be deemed improperly planted than was in fact the case, and (b) "concealed" from plaintiff "the extent of alleged planting deficiencies" and precluded rectification of any such deficiencies.[4] While the second of these claims has no merit, the first is, to the extent indicated hereinafter, valid.

### The Facts [5]

Notice to proceed was issued to plaintiff January 3, 1980. Performance of the work was to begin within 10 calendar days after receipt of the notice to proceed, and was to be completed within 60 days thereafter. The performance period thus fixed was the usual time of year for reforestation in the Loon Lake Resource Area.

At a prework conference, plaintiff indicated that it intended to perform the contract work with two 10 to 12 man crews,

and that such a work force should be adequate to complete the tree planting within 60 days. Plaintiff actually began work January 15, 1980, with one crew of 12 men. Primarily because of an initial high employee turnover rate, plaintiff was unable to supply two full work crews during the first few weeks of contract performance. By February 7, 1980, it was apparent that plaintiff was considerably behind schedule, and BLM had become concerned about plaintiff's lack of progress.

A BLM representative met with representatives of plaintiff at the BLM office in Coos Bay on February 7, 1980. After some discussion of the situation, it was agreed that plaintiff would increase its work force from two crews to four crews. The government representative indicated that BLM could "handle" four work crews, i.e., that a BLM inspector could be behind each crew at least part of the time the crew was planting trees, observing planting operations and indicating informally how the planting was progressing. Such a process of observation and informal advice of planting defects in fact occurred and persisted throughout the remainder of the contract work.

BLM inspections of planting units for pay purposes are frequently made concurrently with the planting. Such an inspection, termed an "administrative survey," is an informal one, consisting of random selection by a BLM inspector of a plot for inspection, and a rough calculation in the field of defective planting rates. In administrative surveys, inspectors tend to focus on individual planters having the most difficulties. In consequence, such surveys are frequently if not invariably biased against a contractor, and can easily lead to exaggerated notions of planting deficiencies.

---

3. These are referred to by plaintiff as "no pay units"; the contract bid price for the 7 planting units (determined by multiplying the relevant per acre bid prices by the number of acres involved) was $19,984.

4. Plaintiff's second claim is limited to trees found to be "high," i.e., trees not planted (in BLM's view) to the depth required by the contract. Plaintiff contends that but for "high"

trees some no pay units would have been pay units, and that a lesser downward adjustment in bid prices would have been made for most pay units.

5. Additional facts necessary to understanding and disposition of specific arguments will appear in conjunction with those arguments.

Plaintiff's contract provided—perhaps in recognition of the facts just described—that an administrative survey could not be used as the basis for a conclusion that a planting unit was a "no pay unit," and that "[i]f, as a result of administrative survey, the payment adjustment factor is greater than 15%, a systematic survey will be made prior to final determination on payment for a planting unit." A systematic survey of a planting unit involves a minimum of two plots per acre, inspection of each planted tree on a plot for a variety of potential defects, and calculation of a PAF for the unit by use of a rather complex formula. *See* note 8, *infra.*

BLM conducted an administrative survey on the first unit planted by plaintiff under the contract. That unit, planted January 15 and 16, 1980, and inspected January 16, 1980, failed badly.[6] Because of the considerable defects in planting being observed by the BLM inspectors, it was concluded that administrative surveys *per se* would be unfair to plaintiff, and most probably could not be employed to determine the payment due plaintiff for a particular planting unit. The BLM accordingly decided to (and did) dispense with administrative surveys for pay purposes, follow a course of informal inspections (or observations) in the field during planting operations, and conduct a subsequent single, systematic, survey of each planting unit, after planting of that unit had been completed, for pay purposes.

One factor affecting the timing of the systematic surveys was that the method of planting used by plaintiff ("U-planting") made it difficult if not impossible for a BLM inspector to perform a systematic survey of a planting unit while planting was in process. Another was the relatively slow progress made by plaintiff throughout the first part of the contract performance period. As a result, plaintiff doubled the number of crews it had intended to use in February 1980, thereafter planted much more acreage in a fairly short period than would otherwise have been the case, and thereby strained BLM's available inspection resources. In combination, these factors resulted in some delays between the completion of planting of a particular planting unit and the systematic survey of that unit for pay purposes.[7]

It should perhaps be noted, at this point, that plaintiff does not really challenge the BLM's decision to dispense entirely with administrative surveys, in favor of systematic ones, for pay purposes. The gravamen of plaintiff's complaint is that the BLM failed to conduct a systematic survey of a planting unit at or near the time planting of that unit was completed, not that BLM committed a breach of contract by performing a systematic survey for pay purposes.

Of the 25 planting units here relevant, only one had a PAF of less than 2 percent. Only three had a PAF of less than 10 percent, and seven had a PAF of greater than 15 percent. Plaintiff therefore received full payment at the contract bid price for only one planting unit, and it received no payment for more than 25 percent of the planting units (and nearly 25 percent of the acreage) covered by its contract.

In a decision dated March 12, 1981, the contracting officer denied all claims of plaintiff to additional compensation under the contract. The record does not indicate precisely when the contracting officer *received* the said claims.

### Discussion

### The Belated Surveys Claim

One claim advanced by plaintiff is that BLM's delays in inspecting plaintiff's tree planting work to determine for payment purposes the PAF applicable to a planting unit were directly responsible for at least some of the planting "deficiencies"

---

6. After a systematic survey, a PAF of 18 percent was ultimately determined for that planting unit.

7. BLM's efforts to get in touch with plaintiff to arrange for the presence of a representative of the latter during some systematic surveys—an invitation subsequently not accepted by plaintiff—further compounded the delay.

attributed to plaintiff by defendant.[8] Plaintiff goes on to say that it is accordingly neither permissible nor proper to penalize it for all such claimed "deficiencies." The claim rests on two separate lines of argument, neither of which is sound.

One is that government delay in inspecting planted units, when combined with weather conditions in the contract work area—among other things, plaintiff alludes to rain, snow, cold, frost-heave, and wind—led to "soil subsidence"; that at least some of the trees found to have been planted "high" were in fact properly planted, and were subsequently left "high" by subsidence; and that the reductions in contract bid price (see note 4, *supra*) made in consequence of such "high" trees are erroneous and unjustified. The short answer to this line of argument is that the proof wholly fails to justify it.

The weight of the credible evidence in the record in this case is that, given the weather conditions that prevailed in the Loon Lake Resource Area during the period here relevant, soil subsidence of the sort, and of the magnitude, claimed by plaintiff simply did not occur.[9] It is not proven that much if any real soil subsidence occurred, nor has plaintiff established satisfactorily that it was adversely affected by any delays between completion of contract work on a planting unit and survey of that unit for pay purposes.[10]

Moreover, daily diaries of BLM's field inspectors in evidence show clearly that during inspections made contemporaneously with the planting operations being reported upon, large numbers of "high" trees were observed. The conditions thus observed did not result from, and indeed could not have been caused by, the soil subsidence asserted by plaintiff, but were, rather, the direct result of improper planting. On the entire record, the soil subsidence aspect of the belated survey claim fails.

The second line of argument seems to be that defendant was under some sort of a duty to monitor plaintiff's planting operations at all times, to keep it informed of any planting deficiencies, and to give plaintiff an opportunity to rectify any failures to comply with the contract, and that, in consequence of defendant's asserted breaches of duty in these respects, the PAF reductions taken are erroneous and unlawful.[11] This is specious.

Pretermitting at this point the validity of the no pay provision (to be discussed *infra*), plaintiff has pointed to nothing in the contract, or in reason, that would justify shifting to defendant any responsibility for plaintiff's failures to plant trees as called for by the terms of the contract. Nor is there any discernible basis for not reducing plaintiff's bid price by an equitable amount, as provided in the contract, for its planting deficiencies. Neither an asserted failure to perform systematic surveys concurrently with planting, nor a failure to give to plaintiff written inspection reports, justifies or excuses plaintiff's departures from contract requirements, or entitles it to full payment for less than satisfactory work.

**8.** The PAF for a unit was determined by inspecting a number of plots, of a radius determined by the spacing specified on the bid schedule, to ascertain the number of "Underplanted (plantable) plots," "Overplanted (plantable) plots," "Planted trees inspected," and rejections for improper planting (for specified reasons and in total). The results were then placed into an "Analysis Formula (Percent)" utilizing (among other things) a "Lower Confidence Limits * * *" table. The bottom line was a PAF derived by adding an "Improper planting factor" and an "Improper spacing factor" having two components ("underplant" and "overplant.")

**9.** Weather conditions at the contract work site were, if wet, essentially unremarkable throughout the relevant period.

**10.** While the record is imprecise as to the interval between completion of planting and survey for pay purposes of each planting unit here relevant, that interval (for no pay units) ranged from 0 to 23 days. The record tends to indicate that some greater than usual delays in surveys for pay purposes occurred, but does not show that plaintiff suffered any harm therefrom.

**11.** Specifically, plaintiff charges that defendant "concealed from the contractor the extent of alleged planting deficiencies," and "prevented [it] from rectifying planting deficiencies * * *."

Plaintiff undertook to plant trees for defendant in a specific area, and in a specified manner. Its contract contained a number of drawings or diagrams illustrating plainly, and in detail, how to plant a seedling in a "satisfactory" manner, as well as what would be deemed an "unsatisfactory" planting. Plaintiff's crews were repeatedly—if orally—advised by BLM inspectors that deficiencies in planting were occurring.[12] In all the circumstances, it cannot validly be concluded that defendant breached any obligations to plaintiff concerning contract performance by the latter. Nor could it fairly be said that plaintiff suffered any real harm in consequence of government actions or inactions in this respect, in any event. Accordingly, the claim of damage due to belated surveys must be denied.

### The No Pay Units Claim

■ Plaintiff asserts, and defendant in effect concedes, that the no pay provision of the payment clause of plaintiff's contract— by its terms precluding any payment to plaintiff for planting a unit, even where as much as 84 percent of the trees were properly planted, if the PAF for that unit exceeded 15 percent—is (in plaintiff's words) "in the nature of a liquidated damages clause." They differ, however, as to the validity of that provision, plaintiff contending that it is "unenforceable as a penalty," and defendant that it is "not void." Defendant's position rests upon an erroneous reading of the record and the law.

Where liquidated damages provisions "are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced." *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947); *See* also *International Electronics Corp. v. United States,* 227 Ct.Cl. 208, 228, 646 F.2d 496, 508 (1981);

*Jennie-O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 337, 580 F.2d 400, 414 (1978); *Higgs v. United States,* 212 Ct.Cl. 146, 151–52, 546 F.2d 373, 376–77 (1976). Where, however, such provisions are "included not to make a fair estimate of damages to be suffered but to serve only as a spur to performance, * * * courts do not give their imprimatur to such arrangements." *Priebe & Sons, Inc.,* 332 U.S. at 413, 68 S.Ct. at 126–127.

A no pay provision similar to that in plaintiff's contract has been included in BLM tree planting contracts since about 1974.[13] Whatever the reasons for including such a provision in any BLM contract, however, the justifications therefor are less than clear. The record contains no data whatever directly correlated to planting. There is a suggestion that a poorly planted unit may ultimately produce less than the yield of lumber BLM hopes to attain from that unit when it is harvested many years later, but it cannot fairly be said that the no pay provision represents any reasonable estimate of probable or even possible damage to defendant from planting deficiencies leading to a PAF of 16 percent or more.[14]

More specifically, the record does not establish that no pay units require interplanting, or destruction and replanting, any more frequently than pay units accepted by BLM. Indeed, a very large number (in terms of percentages) of no pay units are neither interplanted nor destroyed and replanted, but can and do survive, and have considerable value to the government. For purposes of deciding whether to interplant or destroy and replant it, a no pay unit is evaluated in the same manner as is a pay unit; and, both pay units and no pay units alike may be interplanted or destroyed and replanted.

The record contains neither justification nor even explanation why BLM established

---

**12.** The record abundantly dispels any notion that plaintiff's crews were uninformed about, and unaware of, planting deficiencies during contract performance.

**13.** BLM has been involved in reforestation activities since about 1971.

**14.** Survival rates of seedlings and future lumber yields may be affected adversely by a variety of factors wholly unrelated to the skill of a planting contractor.

a PAF of more than 15 percent as barring *any* payment for planting work. It fails to show that a unit having a PAF of 16 or greater percent will result in no benefit to the government, nor does it indicate that any reasonable estimates of probable or possible damage led to the promulgation of the no pay clause as it appeared in plaintiff's contract. That a no pay planting unit may at times be interplanted or destroyed and replanted, or that a reduced lumber yield some years down the road *might* ensue [15], does not make the clause any less a penalty.

Indeed, there is no substantial, proven, difference between a planting unit having a PAF of 15 percent and one having a PAF of 16 percent, save that here challenged by plaintiff. For the former, defendant is obligated to make payment at contract bid prices, less a downward equitable adjustment. For the latter, however, it need not pay at all. On *this* record, such a result can only be termed a penalty, and held to be unenforceable. *Priebe & Sons, Inc.,* 332 U.S. at 411, 68 S.Ct. at 125, 126; *Higgs,* 212 Ct.Cl. at 152–53, 546 F.2d at 377; *see also Davy v. Crawford,* 147 F.2d 574, 575 (D.C. Cir.1945).

This result is reinforced by *Charley O. Estes, d.b.a. Phoenix Reforestation Co.,* IBCA No. 1198–7–78, decided August 11, 1983, and involving facts and contract terms essentially similar (insofar as the no pay provision issue is concerned) to those presently before this court.[16] In that appeal, the Department of Interior Board of Contract Appeals held that the no pay provision "is an unenforceable penalty clause providing for a forfeiture, or no pay to the contractor, without reasonable relationship to his degree of nonconformance to the planting requirements." (footnote omitted).[17] *See* also *Graybar Electric Co.,* IBCA No. 773–4–69, 70–1 BCA (CCH) ¶ 8121 (1970), and authorities there cited. The reasoning of *Estes* is applicable and persuasive, and the result there reached is sound.

## The Amount of Recovery

Plaintiff is not entitled to recover on its delayed inspection claim, but is entitled to recover for planting the no pay units for which it has received no compensation whatever. Plaintiff is, however, not entitled to *full* payment, at its unit bid prices, for planting units in which a PAF of more than 15 percent was properly calculated. So to hold would be to overcompensate it for work not performed in accordance with contract requirements, and in disregard of a contract provision explicitly authorizing a downward equitable adjustment in bid price for deficiencies in planting, at least where the PAF for a unit was 15 percent or less. In the circumstances of this case, it is just and proper to make an appropriate downward equitable adjustment in the bid price for a planting unit having a PAF of *more* than 15 percent as well. Accordingly, such an adjustment will be made in calculating the amount of plaintiff's recovery for each no pay unit here involved.

The unit number, PAF, acreage, bid price, and total price for each of the no pay units here involved is as follows:

---

**15.** In this respect, the record contains only vague speculation, and permits no informed factual conclusions. It does firmly establish, however, that many no pay units are not without substantial value to defendant.

**16.** *Estes* is cited in plaintiff's reply brief, filed, by leave of court, out of time. In permitting the filing of the reply brief, the court granted defendant leave to respond thereto within thirty days. Defendant did not avail itself of the opportunity to do so.

**17.** Recovery was, however, limited to "the payment factor percentages established for satisfactory performance in the no-pay units * *." In concrete terms, given a PAF of 25 percent for one planting unit, and 19 percent for another, the Board allowed 75 percent of the contractor's bid price for one planting unit, and 81 percent of its bid price for the other.

| Unit Number | PAF | Number of Acres | Per Acre Bid Price | Total Price | Adjusted Total Price [18] |
|---|---|---|---|---|---|
| 2 | 18 | 6 | 120 | 720 | $ 590.40 |
| 7 | 24 | 51 | 104 | 5,304 | 4,031.04 |
| 8 | 17 | 29 | 120 | 3,480 | 2,888.40 |
| 12 | 20 | 49 | 104 | 5,096 | 4,076.80 |
| 14 | 16 | 6 | 120 | 720 | 604.80 |
| 17 | 28 | 12 | 120 | 1,440 | 1,036.80 |
| 25 | 22 | 31 | 104 | 3,224 | 2,514.72 |
| | | | | | $15,742.96 |

Plaintiff is accordingly entitled to recover $15,742.96, together with interest thereon, pursuant to, and in accordance with the terms of, 41 U.S.C. § 611 (Supp. V 1981), from March 12, 1981, until payment thereof.[19] The Clerk will enter judgment for plaintiff, pursuant to RUSCC 58, in conformity with the foregoing.

---

**18.** The adjusted total prices are calculated by subtracting an amount determined by multiplying the PAF for a unit by its total price from that total price.

**19.** Section 611 provides for the payment of interest on amounts found due contractors on claims "from the date the contracting officer receives the claim pursuant to section 605(a) of this title from the contractor until payment thereof." While the exact date the contracting officer received plaintiff's claims is unclear, allowance of interest from March 12, 1981, the date of the contracting officer's decision denying them, until payment—at a variable rate determined in accordance with section 611—is deemed appropriate.