## INTERNATIONAL ELECTRONICS CORPORATION

v.

## The UNITED STATES.

No. 445–78.

United States Court of Claims.

April 8, 1981.

Leonard Petkoff, Washington, D.C., attorney of record, for plaintiff; Tod Gold, Washington, D.C., of counsel.

Donald Boday, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KASHIWA, Judge.

---

\* The trial judge's recommended decision and conclusion are submitted in accordance with former Rule 166(c). General Order No. 2 of 1979 deleted former Rule 166, effective June 27, 1979; motions pursuant to Rule 163(b) filed prior to June 27, 1979, however, continue under

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case is before the court on defendant's request for review of the report of Trial Judge Lloyd Fletcher.

After consideration of the briefs and oral argument of the parties, we adopt the report, as modified, as an opinion of this court. Because we find it unnecessary to reach the issue of whether the Government's actions constituted a "cardinal change" of the contract, we delete that portion of the report discussing the issue.

The trial judge's report, as modified, follows:

## OPINION *

FLETCHER, Trial Judge:

This case comes before the court for review of a decision by the Armed Services Board of Contract Appeals pursuant to the well-known standards of the Wunderlich Act.[1] The dispute arises out of a contract for the calibration, preventive maintenance, and repair of test, measuring, and diagnostic equipment (TMDE) at various United States Government sites located throughout the Republic of Korea.

The contract was entered into by International Electronics Corporation (IEC) and the Eighth United States Army on October 1, 1973, and was to run until September 30, 1974, for a consideration not to exceed $206,254.08. However, the contract was terminated for default on November 3, 1973, on the ground that IEC had failed to provide the number of technicians allegedly required by the contract. IEC timely appealed from this default termination on November 13, 1973.

The services to be performed under the contract were subsequently provided by in-

---

former Rule 166(c) procedures. Defendant's motion for summary judgment was filed December 11, 1978, and plaintiff's cross-motion was filed Feb. 9, 1979.

1. 41 U.S.C. §§ 321–322 (1976).

house Army personnel located in Korea and at Sugami Depot, Japan, until a reprocurement contract for the required services was awarded to Kentron Hawaii, Ltd.[2] On February 6, 1974, the Government made demand on IEC for excess reprocurement costs in the amount of $44,123.70. IEC timely appealed from this decision on February 21, 1974.

A hearing on both appeals was held in Seoul, Korea, by the Armed Services Board of Contract Appeals between April 15–28, 1974. On February 25, 1976, the Board rendered an opinion[3] which denied IEC's appeals and awarded the Government excess costs in the amount of $56,971.87 for a total of $12,848.17 greater than the excess costs originally asserted in the Contracting Officer's decision. Plaintiff then filed a Motion for Reconsideration which was denied by the Board on June 2, 1976.[4]

In this appeal to the Court of Claims, IEC makes a series of alternative arguments. It says that the default termination sustained by the Board must be changed to termination for the convenience of the Government. This contention is essentially based on IEC's assertion that its contractual obligation to provide "sixteen man month's level of effort" did not, and was never intended to, obligate the contractor to provide 16 technicians in the form of 16 different persons. In support of this interpretation, IEC points to a liquidated damages provision in the contract and says it was the Government's sole remedy for any failure by the contractor to provide a "sixteen man month's level of effort". In any event, IEC claims it was excusably delayed in performing its contractual obligations due to both an unanticipated technicians' strike and to the defend-

ant's failure to provide contract-designated Government furnished property.[5]

IEC further seeks reversal of the Board on the ground that procedural errors were committed by the Contracting Officer in the default termination and by the Board at the first ASBCA hearing. In the alternative, IEC argues that the Board's award of excess costs must be stricken even if this court should determine that the default termination was properly done.

In the view I take of this case, it becomes unnecessary to address the latter arguments made by plaintiff in this extensive laundry list. In my opinion, the plaintiff's cross-motion for summary judgment should be granted and the defendant's motion for summary judgment denied for the more restrictive reasons set forth below.

### The Facts

At the outset, it is necessary to determine whether the facts as found by the ASBCA satisfy the Wunderlich Act criteria that "any such decision shall be final and conclusive unless the same is [fraudulent] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence".[6]

With the exception of finding No. 6, the Board's factual findings do appear to satisfy these tests. The remaining findings, however, are insufficient in scope to reveal the errors committed by the Board in arriving at its conclusions of law. This opinion must therefore commence with a chronology of the events that put an end to this contract during its very first month of existence.

On August 7, 1973, the United States Army Korea Procurement Agency (KPA)

---

2. Kentron had preceded IEC as contractor for these TMDE services during the 1972–73 contract period.

3. ASBCA Nos. 18934, 19176, Contract No. DAJB 03–74–C–3016, 76–1 BCA ¶ 11,817 (1976).

4. ASBCA Nos. 18934, 19176, Contract No. DAJB 03–74–C–3016, 76–2 BCA ¶ 11,943 (1976).

5. IEC also seeks damages on two counts of breach of contract, claiming that the Government failed to fulfill its contractual obligation to provide Government-furnished-equipment of the types, quantities, and in the condition required by the contract, and that the Government usurped IEC's rightful authority as final arbiter of the qualifications of its technician employees.

6. 41 U.S.C. § 321.

issued solicitation number DAJB 03–73–R–3182 for the procurement of the calibration, preventive maintenance, and repair of test, measuring, and diagnostic equipment at seven designated sites in the Republic of Korea. The work to be contracted comprised use of precisely measured "standards" to test and correct the calibration accuracy of sensitive electronic equipment employed in advanced military technology. Performance of these services was thus essential for maintenance of a combat readiness posture by American troops in Korea.

Of the nine firms submitting proposals, negotiations were conducted with those four offering the lowest bids. The lowest offeror, Universal American Enterprises, was determined to be non-responsive, and the contract was awarded to IEC on September 27, 1973, at a price of $206,254.08.[7]

The contract went into effect on October 1, 1973, and was to continue for a 12-month period. Under its terms, IEC was to provide a total of 16 "man months level of effort per month"[8] of technician services at the designated locations in Korea. In elaboration of this unusual manning terminology, the contract included two clarifying provisions, as follows:

(1) A Man Month is defined as one man working one calendar month on a forty hour per week/8 hour per day basis. No work will be required on US Holidays *except* at the US Army Camp Carroll Depot, Waegwan, where services will be required on US Holidays but not on Korean Holidays.

(2) If the minimum man months level of effort called for above are not furnished by the Contractor each working day, whether caused by sickness, vacation, *lack of available technicians,* or for other reasons, the monthly amount payable shall be reduced by Three Dollars and Eight Cents ($3.08) per hour for each absent work hour. This does not in any way minimize the Contractor's obligation to use as many employees as are necessary for proper contract performance. At the discretion of the Contracting Officer's Representative (COR), administrative time away from the job site may be permitted to comply with foreign employment requirements, i. e., securing automotive registration, identification cards, visa, and required immunization.[9] [Emphasis supplied.]

Provision for minimum staffing was made in a separate article in which it will be noted there is no provision requiring a minimum number of technicians:

### ARTICLE XXVII—WORK LOCATION AND MINIMUM STAFFING REQUIREMENT:

Services shall be performed in the AN/TSM–55(V½) vans provided by the Government for the units supported at the locations as hereinafter indicated, on a 40-hour per week basis as specified in paragraph 3.1.4 of the PURCHASE DESCRIPTION. Vans are subject to change in location from time to time in relation to reductions in troop strength or units deployed. The Contractor shall provide, *as a minimum,* the number of supporting supervisory and administrative staff as hereinafter indicated. The total Calibration/Repairs Per Month indicated is based on averages of past experience and projected workloads for the units supported. The Contractor shall be responsible for advising the Contracting Officer's Representative whenever the workloads indicated decrease or increase by 25 items or more; or whenever the Contractor feels the workload should be restructured due to a lessening of workload requirements. [Emphasis in original.]

\*　\*　\*　\*　\*　\*

---

7. IEC's proposal was approximately $7,600 more than the nonresponsive offeror and approximately $22,000 less than the next lowest. No protests were filed by any of the other firms that submitted offers on this contract.

8. Contract DAJB 03–74–C–3016, Article II—Schedule of items.

9. Id., Art. II, Notes 1 and 2.

Minimum Supervisory and Administrative Staffing Requirements:

 Area Supervisor .................. 1 ea.
 Electronic Supply Specialist ........ 1 ea.
 (must have typing ability)

The contract also established detailed qualification standards for the technicians hired by IEC and required IEC to furnish the Contracting Officer with evidence of compliance with those standards.

In a separate Article designated "Government Furnished Property", the contract obligated the Government to furnish all tools, equipment, materials, supplies and facilities needed to perform the TMDE and calibration services specified in the contract.

In addition, the contract incorporated by reference the then current ASPR standard clauses governing Changes, Disputes, Default, Termination for Convenience of the Government, and Government Delay of Work.

In its proposal submitted September 4, 1973, the contractor submitted a list of 14 technicians it intended to employ and enclosed their resumes. IEC submitted an additional list of 9 technicians, all of whom were incumbent technicians or had previously worked on the earlier calibration contract. On September 13, a further list of 9 others, together with supporting resumes, was submitted. During pre-award negotiations, KPA informed IEC that two of these technicians were not qualified according to their resumes. Consequently, these men were never hired. IEC therefore assumed that the 30 other prospective employee-technicians whose resumes had been submitted or who had performed on the prior contract would be acceptable to KPA.

On September 27, 1973, just prior to signing the contract, Mr. James Malone (Director of Government Contracts for IEC) requested from the Procurement Contracting Officer, Mrs. Theresa Watson, a one-month delay in commencing performance for the purpose of mobilizing personnel. Mrs. Watson denied the request and informed Malone that IEC would be legally bound by the contract terms and would be expected to be fully manned and operational by 8:00 a. m. on October 1, 1973. Mr. Malone nevertheless signed the contract for IEC and the company proceeded with strenuous efforts to expedite recruitment. According to IEC's consolidated report, it had succeeded in signing up 11 technicians over the weekend preceding October 1.

However, even prior to any review of the technicians' resumes, Mr. Antonio Carr, KPA's Contracting Officer's Representative, advised IEC that one Gary Baxter would not be acceptable for work on this contract due to his ration control violations and performance problems in working on the prior contract for TMDE maintenance held by Kentron. IEC therefore refrained from placing Baxter on assignment. In response to Carr's inquiry of October 3, 1973, regarding the status of the contract, IEC replied that 10 technicians plus an area supervisor and supply specialist were at work.

On October 8, Mr. Malone and Mr. Santos, Chief Engineer at IEC and Project Manager on this contract, met to discuss the recruitment situation, which they then viewed as "critical". Malone informed Santos that all possible sources were being explored and that advertisements had been placed in several newspapers. The following day, Mr. Carr conducted a post-award conference with the contractor. Carr stressed that the contract required IEC to submit a Form SF171 for each technician hired, and warned a cure notice would be issued pursuant to the provisions of ASPR–8–602.3(b) if IEC did not have 16 technicians working before October 15.

Following several unsuccessful interviews, on October 11, Santos succeeded in finding a qualified applicant in the person of James Ponsford, whom he signed on as lead technician for the Camp Casey site. Although the contract required all contractor employees to be United States citizens, Santos believed that Ponsford's British citizenship would probably present no problem because "a mutual industrial security agreement" existed between the United States, the United Kingdom, and Canada.

On October 15, 1973, a meeting was held between Mr. Malone and Mr. Carr at which Malone stated that the following 12 IEC personnel were working as technicians: Arnold, Beach, Cain, Clark, Cunningham, Jones, Kuhn, Light, Shelton, Tracewell, Turner, and Whitworth. Carr informed Malone that resumes had been submitted for only six of these technicians, and those six,[10] were considered qualified. Since resumes had not been submitted for the other six, however, KPA did not consider them qualified.

On October 16, 1973, Major Richard Thompson, Contracting Officer on this project wrote Malone that IEC's request for Ponsford's employment on this contract was denied because of his British citizenship. On the same date Major Thompson also directed a "cure" letter to Mr. Malone which read as follows:

Reference is made to Article II, Contract DAJB03–74–C–3016 which requires your company to provide, as of 1 October 1973, a total of sixteen (16) technicians for performance of TMDE at seven locations in Korea. Reference is also made to Section 3.1.2 of the Purchase Description of this contract which requires your company to furnish a qualification statement to the Contracting Officer for each of the sixteen (16) contractor technicians required by the contract terms.

As of this date, you have provided a total of twelve (12) technicians and have furnished qualification statements for only six (6) of these technicians. Accordingly, you are hereby notified that the Government considers (1) your failure to provide sixteen (16) technicians, and (2) failure to provide a qualification statement for each technician, as conditions that are endangering performance of the contract in accordance with its terms. Therefore,

unless this condition is cured within fifteen (15) days after receipt hereof, or you furnish explanation which in the opinion of the Contracting Officer establishes excusable delay, the Government may terminate this contract for default under the provisions of the Default Clause, General Provision B2, Contract DAJB03–74–C–3016.

In the event of termination for default, attention is called to your potential contractual liabilities contained in the default clause.

On October 20, Mr. Carr received word from IEC that Technician Jones had resigned,[11] leaving a total of only 11 technicians working. Two days later Santos interviewed two applicants, found one unqualified, and determined that the other, Mr. Hughes, would be appropriate for the lead technician spot at Camp Casey in place of Ponsford.[12] On October 23, IEC sent to KPA resumes for Hughes and another new recruit, Thomas Auldridge.[13] These were reviewed by KPA, found to lack essential information, and returned to IEC the same day for supplementation. The following day IEC provided additional information on both men, which indicated to KPA that Hughes was qualified but that more information was still needed on Auldridge. Resumes for Rucker, Warren, and Ruckner, all new calibration technician recruits, and for Clark, Cain, Tracewell, Turner, and Whitworth, all of whom were already performing on the contract, were also submitted on October 24. KPA immediately notified the contractor that based on available information, only Clark, Tracewell, and Whitworth were qualified. IEC also submitted a resume for Gary Baxter, who had been disqualified by KPA prior to the beginning of contract performance. In response, COR Carr notified IEC that, although Baxter

---

10. Arnold, Cunningham, Jones, Kuhn, Light, and Shelton.

11. Jones had informed IEC of his resignation on October 16, due to dissatisfaction with his salary.

12. Subsequent to his disqualification by KPA, IEC had decided to keep Ponsford on the payroll for a month for the purpose of preparing a status report on "deadlined" equipment at the Camp Coiner sites.

13. Like Cain and Baxter, Auldridge had been previously employed on the Kentron contract of October 1, 1972—September 30, 1973.

appeared qualified, certain derogatory information concerning his ration control violations was the subject of further investigation. Pending such investigation, Baxter did not go on site as a technician. Accordingly, at this point, KPA had approved only 9 technicians, out of a total of 12 who were actually at work on the contract.

On October 25, KPA received additional information on Warren and approved his resume. However, Warren was then in Korea on a 5-day visa from Vietnam, and had to return to that country to obtain permanent travel papers. On October 27, KPA reviewed a resume for Beach, a technician already working on the contract, which indicated he was qualified. IEC then had a total of 11 qualified technicians, of whom only 10 were on the job due to Warren's travel problems. Rucker and Turner, whose resumes were also reviewed on October 27, were found not qualified.

On October 29, technicians Arnold and Whitworth informed Santos that they were both resigning as of October 27 due to dissatisfaction with the contract salaries of $526 per month for calibration technicians and $550 for lead technicians.[14] Upon hearing this news, Malone instructed Santos to tell these men that IEC was willing to offer $600 per month to lead technicians and $550 to the calibration technicians. Arnold and Whitworth responded that this offer was unsatisfactory and refused to discuss the matter further. On October 30, five more technicians also resigned and stated that they would remain off the job unless and until salaries were raised to $750 per month for lead technicians and $700 for calibration

technicians.[15] Thereupon, two other technicians walked off the job in support of those personnel who had resigned.

This mass exodus left IEC with only three technicians performing, of whom only two had been found qualified by KPA. Malone immediately notified KPA of the strike situation, and a meeting was quickly arranged between Major Thompson, Malone, and Santos. At this meeting, Malone asked KPA to consider granting a cost-of-living allowance in the amount of $4 to $5 per day to meet the demands of the technicians who had walked out. Thompson refused the request and took the position that the wage dispute was strictly a company problem.

Concurrently, IEC was continuing its efforts to bring its staffing level up to full capacity. On October 30, IEC contacted Auldridge, a potential calibration technician as yet unapproved, and arranged for him to fly in from Bangkok. Malone was also in contact with Messrs. Tuttle, Donner, and Stanley, who had formerly been employed as calibration technicians on the previous contract with Kentron. These men indicated willingness to resume their prior duties if salaries were raised to the $700 to $750 level demanded by the strikers.

In view of these facts, Malone faced the choice of granting the strikers' demands at the cost of $40,000 loss to IEC on the contract, or suffering probable default for failure to perform calibration of TMDE. Malone firmly believed that the strike was the result of a conspiracy, led by Kuhn and Shelton,[16] to force IEC into default and

---

14. The employees had first indicated their salary grievances by initiating a work slow-down during the week of October 22–29.

15. The technicians manning the contract were primarily retired military personnel for whom inflation was a serious problem. IEC had contemplated that the low wages paid Americans on this type of contract might cause trouble and had proposed in its initial negotiations with KPA an alternative manning schedule utilizing both American and Korean technicians. Under the alternate arrangement 8 American technicians would have been employed at $862.50 per month each ($4.97 per hr.) and 8 Korean tech-

nicians would have been paid substantially less. Calibration technicians performing comparable work in the United States received $5.00 per hour, but KPA rejected the alternative proposal.

16. Striker Shelton was a founder and stockholder of Contracting Engineers' Services, a contractor that had also bid on this contract. Its Vice President, Miss Laura Carr, was the daughter of Antonio Carr, the Contracting Officer's Representative on the IEC contract. Throughout the default appeal hearing, the Board consistently refused to hear evidence on this conflict of interest issue.

secure higher wages from the reprocurement contractor. Indeed, Malone addressed a letter to KPA naming the individuals he felt were sabotaging the contract to achieve "business ends," and implied that such activity might create a threat to the contract's security.

On October 31, Malone resolved IEC's unpleasant dilemma by acceding to the strikers' demands. IEC drafted supplemental agreements awarding the technicians' salaries in the $700 and $750 range, and all strikers returned to work by 1300 hours (1:00 p. m.) on November 1.

Eleven KPA qualified technicians [17] were then on duty, with Warren (who had already been approved) expected back from Vietnam as soon as KPA issued the required travel orders. In addition, Tuttle, Donner, and Stanley [18] were expected at IEC's office on Monday, November 5, and 4 technicians (Baxter, Turner, Cain, and Rucker) whom KPA had disqualified were still available for work. Turner was subsequently approved on Friday, November 2, but Cain was disqualified the same day due to purported admissions of little TMDE experience on his part to COR Carr. Thus at the close of that business day, IEC had a total of 12 qualified technicians performing TMDE maintenance, one qualified technician on the way, and three presumably unobjectionable recruits were available so that it was logical to expect that a total of 16 technicians could be performing by the following week. Moreover, Malone intended to continue his recruitment efforts to bring the total to 20 in order to compensate for man-months of effort lost during October and then replace the strike ringleaders whom he wanted to fire.

However, KPA chose literally to enforce the terms of the cure notice which required 16 technicians on board by October 31. Reviewing IEC's performance as of that date, KPA concluded that IEC had only 11 qualified technicians on hand and had averaged only 10 throughout the first month of performance. Although Malone had notified KPA of the strike, IEC had addressed no formal correspondence to KPA constituting official "explanation" of its failure to produce 16 technicians by October 31, as per the cure notice.[19]

On November 1, a meeting was held during which Major Thompson (ACO), Mrs. Watson (PCO), and Col. Lowe, Director of Maintenance, G–4 (Logistics), 8th U.S. Army discussed the situation. Col. Lowe informed the Contracting Officer that he had in-house capability to provide calibration for 45 days in the event of a default.[20]

The following Saturday, November 3, another meeting was called at KPA headquarters between Colonel Herriford, the Commanding Officer of KPA, Major Thompson, the ACO, and the other Division Chiefs of KPA. At the conclusion of the meeting, Colonel Herriford, who had just returned to Korea, asked Major Keenan, Chief of the Contract Execution Branch, to locate Mrs. Watson to come in and terminate the contract. As Mrs. Watson could not be reached and the ACO lacked authority to terminate, Mrs. Watson's superior, Major Keenan, was appointed successor PCO for the sole purpose of terminating the contract for default.

---

**17.** Beach and Auldridge had been found qualified October 30, and 31, respectively.

**18.** Malone had received prior approval of these three technicians from KPA, but was advised that revised resumes should be submitted.

**19.** The October 16, 1973 cure notice required IEC to man the contract with 16 technicians or, in the alternative, submit to KPA an "explanation which in the opinion of the Contracting Officer establishes excusable delay." This phrase, however, would not appear to obligate the contractor to prepare and forward a formal reply.

**20.** In his testimony before the ASBCA, Chief Warrant Officer Michael Smith testified that on October 31 he had made contingency plans for in-house performance in case of default. When notified on November 3 that IEC had been defaulted, Smith replied that he would be ready to assume the mission on Monday, November 5. At the time he had made the contingency plans, however, he had explained to G–4 Maintenance that in-house performance would require him to stretch his resources very thin by placing personnel assigned to other projects on temporary duty to replace the IEC staff.

Consequently, Mr. Malone received a termination letter later in the day which stated:

You are hereby notified that Contract Number DAJB03–74–C–3016 awarded to International Electronics Corporation (IEC) on 27 September 1973 is terminated in its entirety for default pursuant to the provision of the Default Clause of the contract.

This Notice of Termination for Default is issued as a result of IEC's failure to provide sixteen (16) manmonths of effort required by Article II of the contract during the period 1 October 1973 through 31 October 1973. During this period, IEC provided a total of only ten (10) qualified technicians, and these ten technicians performed less than eight manmonths of effort.

You are further notified that (1) IEC's right to proceed further with performance of the subject contract is terminated; (2) that the services being terminated may be procured against the IEC's account and that IEC will be held liable for any excess costs; and (3) that the U.S. Government reserves the rights and remedies provided by law or under the contract, in addition to charging excess costs.

This Notice of Termination for Default constitutes a decision that the IEC is in default as specified, and that IEC has the right to appeal as specified in the Disputes Clause.

J. KEENAN
Major, QMC
Contracting Officer.

The letter made no mention of the Government's failure to stock calibration sites with the equipment it was contractually obligated to provide, nor did KPA consider this failure to furnish equipment a possible ground for excusable delay in IEC's manning performance. The Government's performance record with respect to this contractual duty, however, was a dismal one. As early as October 1, the Government's lax attitude toward the contract was made evident by its failure to secure the vans' keys from Kentron. Since all the vans were locked, IEC was at the very outset thrown behind schedule in performing inventory and starting calibration.

Inventory of the vans was commenced by Messrs. Santos and Ortiz, Project Managers for IEC and KPA respectively, on October 2 at Camp Walker, which facility was turned over to IEC that day. The van at Camp Carroll, also visited the same day, had been stripped and all equipment taken to a nearby building. At Camp Humphreys, the inventory team discovered that both vans were in very poor condition. All records kept by the prior contractor, necessary to insure continuity of performance, had been removed and presumably destroyed. Tools were short by 50 percent and primary load listings (items necessary for the repair of standards) by 30 percent. At least 60 percent of Government-furnished standards were unserviceable or in need of calibration. The equipment remaining in the van was dirty and in disarray, and, most importantly, faulty electrical wiring in one van presented a safety hazard to the technicians and equipment.[21]

Inspection of Camp Coiner on October 4 uncovered similar unsatisfactory conditions. Tools and primary load listings (PLL) were short 60 percent and 20 percent respectively, and 40 percent of Government-furnished standards needed repair. Again, all Kentron records had been removed and presumably destroyed. While no safety hazards existed at the facility, over 100 items had been awaiting repair in excess of 180 days, creating a critical backlog problem. David Kuhn, IEC's lead technician at this site, testified at the hearing that the Coiner vans were practically void of all essential equipment, making it necessary to perform all work with his own tools.

Camp Casey, inspected the following day, presented shortages of less than 10 percent

---

21. During the course of the hearing, Administrative Judge Watkins refused to hear evidence of the vans' condition while in use by Kentron.

each in tools, primary load listings, and Government-furnished standards. However, the main door seal of the van leaked during rain, allowing the floor to flood. Obviously, any electrical work performed with the van in this condition created a life-threatening hazard. In addition, the van floor had become unfastened and buckled due to repeated floodings, and no heater or air conditioner, essential to maintain the standard's accuracy by preventing temperature warp [22] had been installed.

On the 6th, Santos visited the Yongsan South post to check on progress made by the Supply Specialist. Santos discovered that over 60 percent of the materials were not on stock record cards, and that all materials needed to be identified, cross-referenced, posted and stored—a task requiring an estimated two weeks. Later in the day Santos and Ortiz [23] inspected Camp Kyle, where they found a 40 percent tool shortage and a 20 percent PLL shortage. As at Camp Casey, there was no "environmental control system" to maintain the standards' accuracy. In addition, 30 percent of the standards at Camp Kyle were in need of repair and a substantial backlog existed. At the conclusion of the inspection, Kentron turned the keys over to IEC, as it had at the close of each earlier van inventory.

On October 8, Santos directed a letter to KPA requesting 64 tools be provided the two vans at Camp Coiner in order to allow the calibration technicians to perform their work. On October 12, he addressed a second letter to KPA, requesting records of primary load listings for Camp Coiner and Camp Kyle, and a further letter requesting that one van at Camp Humphreys be re-wired to eliminate the electrical safety hazard. On October 16, Santos again wrote KPA requesting that 18 missing tools be provided at Camp Kyle.

The record is void of any responses by KPA to these requests. However, KPA's response to Santos' request for Army-published technical bulletins and manuals necessary to insure proper performance of the calibration contract seems to have typified the agency's attitude toward IEC's requests:

International Electronics Corporation
APO 96301

> DEF: Contract No.
> DAJB03–74–C–3016
> Calibration

Gentlemen:

Reference your letter of 1 October 1973 which requested that KPA provide you with copies of Army Publications for performance of subject contract. I would direct your attention to Article XXIV—Directives, of subject contract. Here it states that it is the contractor's responsibility to procure and maintain all documents in a current status.

This response ignored the fact that the Army was the sole source from which the documents in question could be procured, and the provision of Article XII, paragraph a. that "the Government will furnish all of those materials, supplies, and facilities as shall be necessary for performance of the work as specified in paragraph 6.1 of the Purchase Description." [24]

---

**22.** Testimony at the hearing established that the equipment had to operate in the 65°–75° range to insure calibration accuracy.

**23.** With the exception of the Walker and Carroll inventories, Santos and Ortiz were accompanied on all inspections by Mr. Tate, a representative of the predecessor contractor, Kentron.

**24.** Paragraph 6.1 read, in pertinent part:
6.1.1 The Government will furnish repair parts to the contractor as required to accomplish the preventive maintenance, repair and calibration services specified in this document.
6.1.2 *All other materials and supplies required to accomplish the services specified in*

*this document shall be furnished by the Government.* [Emphasis supplied.]

\* \* \* \* \* \*

6.1.7 Equipment and other items to be furnished by the Government to the contractor for performing this contract will consist of the following basic items, including all equipment, tools, supplies, materials, etc., installed or accessory thereto as delineated in the unit component parts list or the document upon which such items are inventoried and issued to the contractor:

4 ea Transportable Mobile Calibration Facility AN/TSM 55V(1), FSN 4940–400–2615
Value $75,000

4 ea Transportable Mobile Calibration Facility AN/TSM 55V(2), FSN 4940–400–2614
Value $110,000

Problems of insufficient equipment to perform calibration plagued IEC throughout its month on the contract. Following his disqualification for lead technician at Camp Casey, IEC retained Ponsford as an "overhead" employee performing more detailed backlog inventories so that IEC could provide KPA with accurate biweekly performance reports in the absence of any records of the prior contractor. Prior to termination, IEC completed these backlog inventories at Camps Coiner, Kyle, and Casey. In addition, the company eliminated the safety hazard at Camp Humphreys, installed a heater/air conditioner at Camp Kyle, rehabilitated the central supply facility, and repaired most of the Government-furnished equipment which had been received in inoperative condition.

From November 5, 1973, the date of IEC's default termination, through December 7, the TMDE calibration was performed by 14 military technicians. Due to time pressures, no new invitations were sent out to potential reprocurement contractors.[25] Instead, KPA considered only those firms which had unsuccessfully sought the IEC contract, and negotiated with only two of them, Kentron and Page. These efforts to reprocure began the same day as IEC's termination, and resulted in the award of a one-year contract, commencing December 13, 1973, to IEC's predecessor, Kentron Hawaii, Ltd. The reprocurement contract was awarded November 21, 1973, at a cost of $280,476.00. Like the IEC contract, the Kentron contract called for 16 man-month's level of effort. In substance, the contract was virtually a carbon copy of the IEC contract, with the exception of an increase in liquidated damages for each hour not worked from $3.08 to $4.88. Excess costs of reprocurement were calculated by the Army to total $44,123.70.

On the premise that the termination for default would be changed to a termination for convenience of the Government, IEC submitted a written proposal for reinstatement,[26] dated November 17, 1973, with a revised cost breakdown totaling $299,579.47. In its response of December 6, 1973, KPA summarily denied IEC's request and stated that the reprocurement contract had been awarded to Kentron.[27]

KPA notified IEC of the price awarded Kentron on reprocurement by letter of December 20, 1973. In a subsequent letter of February 6, 1974, KPA made demand on IEC for the excess cost of reprocurement. Pursuant to this request, IEC submitted on February 21, 1974, its notice of intention to appeal to the ASBCA both the amount of excess costs and the termination for default itself. Hearings were held before ASBCA Administrative Law Judge Watkins in Korea during April 15–28, 1975, and a decision was rendered February 25, 1976, upholding the termination for default and awarding the Government reprocurement costs of $56,971.67.[28]

### Discussion

It is well-settled in this court that "[a] contract must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." *Victory Carriers, Inc. v. United States*, 199 Ct.Cl. 410, 421, 467 F.2d 1334, 1342 (1972). While this principle is very widely recognized, *see Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395–96, 351 F.2d 972, 979 (1965), and cases cited therein, it is clear that the Board did not follow it in the present case.

**25.** At the hearing, there was testimony to the effect that it could take up to 150 days to resolicit bids on a project of this scope, whereas KPA had hoped to reprocure within 45 days of the termination date.

**26.** Such a proposal is in accord with ASPR 8–203, par. (d).

**27.** In addition, KPA on December 5, 1973, also sent IEC a letter alleging the latter's unsatisfactory performance.

**28.** Excess costs were calculated for the 332-day period of November 3, 1973 through September 30, 1974, as follows:

| | |
|---|---|
| In-house costs | $ 16,809.94 |
| Plus Kentron costs | 167,559.19 |
| | 184,369.13 |
| Less: IEC contract price, prorated | 127,397.46 |
| Excess Costs of Reprocurement | $ 56,971.67 |

The Board simply erred in its legal conclusion that the contractual requirement for "16 man-months level of effort" was in reality a requirement for the employment of 16 persons (or "bodies" to use plaintiff's word) who were qualified as technicians.[29] The fallacy of this conclusion is apparent even from KPA's termination letter, which stated in pertinent part:

> This Notice of Termination for Default is issued as a result of IEC's failure to provide sixteen (16) man-months of effort required by Article II of the contract during the period 1 October 1973 through 31 October 1973. During this period, IEC provided a total of only ten (10) qualified technicians, and these ten technicians performed less than eight man months of effort.[30]

 A close examination of this contract shows that, correctly interpreted, Article II draws a distinction between number of technicians (or human bodies) and man-months level of effort. The notes to this Article stated:

> (1) A Man Month is defined as one man working one calendar month on a forty hour per week/8 hour per day basis. No work will be required on US Holidays except at the US Army Camp Carroll Depot, Waegwan, where services will be required on US Holidays but not on Korean Holidays.
> (2) If the minimum man months level of effort called for above are not furnished by the Contractor each working day, whether caused by sickness, vacation, *lack of available technicians*, or for other reasons, the monthly amount payable shall be reduced by Three Dollars and Eight Cents ($3.08) per hour for each absent work hour. This does not in any way minimize the Contractor's obligation to use as many employees as are neces-

sary for proper contract performance. At the discretion of the Contracting Officer's Representative (COR), administrative time away from the job site may be permitted to comply with foreign employment requirements, i. e., securing automotive registration, identification cards, visa, and required immunization. [Emphasis supplied.]

Note 1 defines one "man month", *not* one "man month level of effort," as one man working a calendar month on a 40-hour per week/8 hour per day basis. As plaintiff observes, there is a vast difference between "man months" of effort, which is a reference to individuals, and "man months level of effort," which is a reference to a performance level.

Moreover, the liquidated damage provision of Note 2 lists "lack of available technicians" as one of many potential causes for failure to provide the minimum man months level of effort. The clear distinction thus drawn by the manner in which these terms were employed in the sole contract provision addressing level of effort dictates the conclusion that the term "one man month level of effort" was not intended to be a synonym for "one technician."

Although the Government has not raised the point, an argument could be made that the provision of Article XXVII (Work Location and Minimum Staffing Requirement) that "[s]ervices shall be performed in the AN/TSM–55(V½) vans provided by the Government for the units supported at the locations as hereinafter indicated, *on a 40-hour per week basis* as specified in paragraph 3.1.4 of the PURCHASE DESCRIPTION," [31] (emphasis supplied) must be read together with Note 1 to Article II to create a requirement that the 16 man months level of effort shall be furnished by 16 techni-

---

**29.** Find. No. 2, 76–1 BCA ¶ 11,817 at p. 56,426.

**30.** An examination of IEC's timesheets at the hearing showed that the company performed a total of 1814 hours of the required 3200 hours (16 man months level of effort). Time spent out on strike and hours of work performed by Cain, who was never qualified, were excluded in calculating the 1,814-hour figure.

**31.** Paragraph 3.1.4 of the purchase description reads: "*Work Hours.* All services under this contract shall be performed during normal US Government working hours 40 hours a week, Mondays through Fridays except US Government Holidays."

cians working on a 40-hour per week/8 hour per day basis.

Of course, this court has consistently held that "an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." *Hol-Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. at 395, 351 F.2d at 979 (1965). This precept, however, is not violated by interpreting the work hours provision as unrelated to the definition of man months level of effort. Indeed, the structure of this contract dictates this result. Article XXVII—Work Location and Minimum Staffing Requirements—is located at the end of the contract under Section J— Special Provisions, and Paragraph 3.1.4 of the Purchase Description—*Work Hours*—is similarly at the end as part of Section M— List of Documents, Exhibits and Other Attachments. Article II's provisions concerning man-months level of effort, on the other hand, fall at the beginning of the contract, under Section E—*Supplies/Services and Prices*. Had the drafters intended the work hours provision to be read into the definition of man months level of effort, one would have expected them to have placed the clauses together so that such an interpretation would flow more logically. As the contract was written, however, the work hours provision can more properly be read as a prescription that the contract be performed during standard business hours.

In any event, no interpretation of the term "man-month level of effort" would negate the force of the liquidated damages provision of Note 2 of Article II, which specified a deduction in contract price of $3.08 per hour for each man hour not worked. It is well established that such liquidated damages clauses are enforceable in Government contracts.

Today the law does not look with disfavor upon "liquidated damages" provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. * * * They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. * * And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract. * * * *Priebe & Sons v. United States*, 332 U.S. 407, 411– 12, 68 S.Ct. 123, 125–26, 92 L.Ed. 32 (1947). [Citations omitted.]

The Court of Claims, with great consistency, has also upheld the validity of liquidated damages clauses in Government contract disputes where such damages were at issue. *See, e. g., Wyoming National Bank of Wilkes-Barre, Pa. v. United States*, 154 Ct.Cl. 590, 292 F.2d 511 (1961); *North Denver Bank v. United States*, 193 Ct.Cl. 225, 432 F.2d 466 (1970); *Young Associates, Inc. v. United States*, 200 Ct.Cl. 438, 471 F.2d 618 (1973); and *Jennie-O Foods Inc. v. United States*, 217 Ct.Cl. 314, 580 F.2d 400 (1978).

█ Of course, it is also accepted doctrine that liquidated damages clauses will be enforced only if the parties did not intend them to be penalties. *See, e. g., Higgs v. United States*, 212 Ct.Cl. 146, 546 F.2d 373 (1976). Clearly, however, the liquidated damages clause in the IEC contract cannot reasonably be construed as a penalty. The $3.08 that was to be deducted from IEC's monthly payment for each hour not worked was derived directly from the original $526 calibration technician salary on which IEC's contract price was based.[32] Similarly, this deduction represented a reasonable estimation as of the contract date of any actual damages that might result to defendant if IEC failed to provide a level of 16 man months of effort per month.

Since the liquidated damages clause here cannot be invalidated as a penalty, it is

---

**32.** This relationship is made evident by the fact that liquidated damages were increased to $4.88 per hour in the Kentron reprocurement contract which was awarded at a higher contract price that reflected increased technicians' salaries.

necessary to construe the clause in the light of other remedies provided by the contract as a whole. With respect to default, the IEC contract incorporated by reference ASPR 7–103.11 (August 69), which read in pertinent part:

7–103.11 *Default.*

DEFAULT (1969 AUG)

(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

(b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services; *provided*, that the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public

enemy, *acts of the Government in either its sovereign or contractual capacity,* fires, floods, epidemics, quarantine restrictions, *strikes,* freight embargoes, and unusually severe weather; *but in every case the failure to perform must be beyond the control and without the fault or negligence of the contractor.* [Emphasis supplied.]

\* \* \* \* \* \*

(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause. If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes".

\* \* \* \* \* \*

It may well be, as the Board held, that technically IEC was in default under Sec. (a)(i) of the clause by its failure to perform 16 man months level of effort during its one month on the contract. However, Sec. (c) of the clause goes on to state that the contractor shall not be responsible for causes beyond the control and without the fault or negligence of the contractor, including failure to perform due to a strike. For a strike to constitute an excusable cause of delay, the strike must substantially impair the plaintiff's performance of contractual

duties. *Tempest Construction Co.*, GSBCA 2647, 69–1 BCA 7672 (1969). It is obvious from the facts discussed above that IEC's ability to provide 16 man months level of effort was greatly hampered by the walk-out of 9 technicians. In addition, but for the strike, the management of IEC would have been able to devote full-time effort to an emergency recruitment of additional technicians. The ASBCA simply ignores the effect of the strike other than to observe that it had "found no causes beyond the control or without the fault or negligence" of IEC.

To avail itself of the excusable delay provision, plaintiff has the burden of proving that the excuse was beyond its control and without its fault or negligence. Plaintiff must further prove that it took reasonable action to perform the contract notwithstanding the occurrence of such excuse. *United States v. Brooks-Callaway Co.*, 318 U.S. 120, 63 S.Ct. 474, 87 L.Ed. 653 (1943). Hence, IEC must establish impossibility of performance brought about by the strike, and it is objective rather than subjective impossibility which is required, *i. e.*, the duty at issue must be impossible for anyone to perform, not just the particular plaintiff. *Jennie-O Foods, supra.*[33]

■ While the question of whether a contract has become impossible of performance is a proper subject for a factual finding by the Board, *Maxwell Dynamometer Co. v. United States*, 181 Ct.Cl. 607, 386 F.2d 855 (1967), the ultimate question is a legal one; that is, whether default is excusable due to "legal impossibility" as defined in *Natus Corp. v. United States*, 178 Ct.Cl. 1, 371 F.2d 450 (1967). In *Natus*, the court stated that "the doctrine of legal impossibility does not demand a showing of actual or literal impossibility." Rather, impossibility may be established by proof of "commercial impracticality." This precept is based on the assumption that in legal contemplation a contractual duty is impracticable when it

can be performed only at an excessive and unreasonable cost. As discussed in *Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 315 (D.C.Cir.1966):

The doctrine ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance.

■ Apparently because it believed the matter to be irrelevant, the Board made no finding with respect to this important matter. However, it is well-established that the Court of Claims may make a supplementary or additional finding without returning the case to the Board if the Board has failed to make a relevant finding of fact and the evidence concerning this factual question is undisputed. Similarly, even where the evidence before the Board is disputed, this court may, without a remand, make a necessary contrary finding if the weight of the evidence points clearly in that direction. *Koppers Company, Inc. v. United States*, 186 Ct.Cl. 142, 405 F.2d 554 (1968); *Maxwell Dynamometer Co. v. United States, supra.*

Regarding the question of impossibility, only one of the Board's findings even approaches the issue as presented in this case:

6. Appellant's counsel devoted much effort during the hearing eliciting evidence in an attempt to show that the Government did not have the sites ready, that tools were missing, that certain necessary technical bulletins were missing, that appellant had been "sabotaged," that Government agents "conspired" against appellant, etc. and was therefore itself in default. Appellant's counsel was advised during the hearing that such evidence was extraneous to the issues raised in this appeal since appellant was appealing a termination for default for failure to pro-

---

33. As explained in *Fast, Inc. v. Shaner*, 183 F.2d 504, 506 (3d Cir. 1950), "If an elderly judge, for good consideration, promises to run 100 yards in 10 seconds and then fails to per-

form he can hardly be held to puff out the defense that he could not possibly run that fast."

vide the requisite man months level of efforts [sic] of qualified technicians and not for substandard work or for any other reason. Appellant's counsel persisted in offering evidence in this vein without showing that any of these reasons actually prevented appellant from having the 16 technicians on board as required by the contract. 76–1 BCA ¶ 11,817 at 56,428.

This finding, however, is limited to the plaintiff's theory of breach by the Government as an excuse under paragraph (c) of the default clause, which will be discussed below. With respect to the reasonableness (or lack thereof) of IEC's recruitment efforts in the face of the crippling strike, the Board's silence is strident. According to the standards outlined in *Koppers* and *Maxwell Dynamometer*, it is appropriate therefore for this court to make a supplementary finding of fact on this issue.

■ The substantial weight of the evidence before the Board indicates that IEC made herculean efforts to comply with the contract's manning requirements. IEC advertised widely in both military and civilian publications throughout much of the Orient,[34] and revised and resubmitted many of its technicians' resumes in attempts to obtain their approval by KPA.

The fact that the strike commenced after the date the duty to provide 16 man-months level of effort per month arose (October 1, the first day of contract performance) does not affect the strike's validity as an excuse for default. A strike which has "a direct and significant effect upon the contractor's ability to continue performance is an excusable cause of delay regardless when it occurs *vis-a-vis* the contract completion date." *George E. Jensen Contr., Inc.*, GSBCA 3280, 71–1 BCA 8841 (1971). In addition, the fact that KPA required IEC to submit resumes along with its bid as proof of ability to recruit, and found IEC's submissions acceptable for the purpose of granting the award supports the conclusion that IEC's

subsequent failure to provide the required level of effort was without its fault or negligence. *Realty Service Co.*, GSBCA 2015, 66–1 BCA 5669 (1966).

This court has held that performance of an identical contract during reprocurement is persuasive that the original contract was not impossible to perform. *Astronautics Corp. of America v. United States*, 193 Ct.Cl. 910, 922, 436 F.2d 430, 437 (1971). Conversely, in cases of defective specifications, failure to find another manufacturer who would or could perform the defective specifications on reprocurement weighs heavily in establishing a defense of impossibility. *Dynalectron Corp. v. United States*, 207 Ct.Cl. 349, 365, 518 F.2d 594, 603 (1975). Although no evidence was admitted at the hearing regarding Kentron's speed in manning the reprocurement contract, it is worthy of comment that Kentron was awarded that contract on November 21, 1973, with an effective date of December 13, 1973. Thus unlike IEC, the reprocurement contractor was given a substantial lead time (22 days) to pursue off-site mobilization.

Moreover, substantial evidence was produced at the hearing regarding prior contractors' performance and the general availability of calibration technicians in the Far East. During the first month of the TMDE calibration contract awarded in October 1971, the Associated American Engineers was missing three to four of the twelve technicians then required. COR Carr testified that there had been similar manning problems in the October 1972 contract held by Kentron. There was uncontradicted evidence in the record that all of the contractors recruited among the same group of technicians, frequently by visiting the men performing on the current contract to ask if they would remain at the job when the next company took over performance. Also, the evidence clearly established that the calibration technician qualifications had been stiffened in the IEC contract so as to elimi-

---

34. IEC's Vice President and Executive Director, John Geddes, visited Okinawa in late October for the purpose of recruiting technicians, sending back Hughes. IEC's recruitment efforts also included letters of solicitation to four technical institutions in the States, and to 22 state employment and Veterans' Administration offices.

nate loopholes that had allowed prior contractors to hire personnel of dubious ability. In view of all these facts, it is impossible to see how IEC was in any way remiss in its efforts to recruit technicians. The only further effort IEC could have made to obtain qualified technicians would have been to send Malone or another executive on a recruitment mission back to the States. Such a measure, however, would clearly have fallen within the *Natus* and *Transatlantic Financing* standard of "commercial impracticability."

In my view, therefore, IEC's default termination must be converted to a termination for the convenience of the Government (pursuant to paragraph (e) of the default clause) since IEC's failure to provide 16 man months level of effort arose from causes beyond its control and without its fault or negligence. The Government is thus relegated to its contractual remedy of $3.08 per hour for each absent work hour attributable to IEC's failure to provide 16 man-months level of effort in its first and only month of performance.

With respect to IEC's claim that the Army's failure to provide the Government furnished equipment standing alone constituted an excuse for default beyond its control and without its fault or negligence as per paragraph (c) of the Default clause, it is important to note that it takes only one valid defense to void a default termination. *Dynalectron Corp. (Pacific Division) v. United States*, 207 Ct.Cl. at 364, 518 F.2d at 602 (1975). In view of the finding here that the labor problems encountered by the IEC, as described above, established a justifiable excuse for delay within the terms of paragraph (c), a finding of excuse due to the Government's breach in failing to furnish the agreed GFE would be superfluous for the purpose of converting IEC's default termination to a termination for convenience of the Government pursuant to paragraph (e) of the Default clause.

As previously demonstrated, the Board has erred legally by misinterpreting the contract, as it did throughout its entire opinion, to require 16 technicians rather than 16 man months level of effort. The two terms are not synonymous and the contract required only the latter. Therefore, it is my opinion that finding No. 6 is both legally erroneous and unsupported by substantial evidence.

In summary, this court concludes the IEC's default termination must be converted to a termination for the convenience of the Government pursuant to paragraph (e) of the Default clause since the company's failure to fulfill its contractual obligation to provide 16 man months' level of effort was beyond its control and without its fault or negligence. The contrary findings and conclusions of the ASBCA are not supported by substantial evidence and are erroneous as a matter of law.

## CONCLUSION

For the foregoing reasons, plaintiff's cross-motion for summary judgment is granted, and the defendant's motion for summary judgment is denied.

This case is remanded to the Armed Services Board of Contract Appeals pursuant to Rule 149 for a determination of the amount of plaintiff's recovery. Further proceedings before this court will be stayed for a period of six (6) months from the date hereof. Plaintiff's counsel is designated to advise the court by letter to the trial judge of the status of the remand proceedings pursuant to Rule 149(f). Attention of counsel and the Board is also directed to Rule 150.