ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Phylway Construction, LLC | )     ASBCA No. 62961 |
| | ) |
| Under Contract No. W912P8-19-C-0015 | ) |

APPEARANCES FOR THE APPELLANT:    Brian S. Wood, Esq.
                                          Jacob W. Scott, Esq.
                                            Smith, Currie & Hancock, LLP
                                            Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                            Engineer Chief Trial Attorney
                                            Thomas M. Taff, Jr., Esq.
                                            Engineer Trial Attorney
                                            U.S. Army Engineer District, New Orleans

## OPINION ON GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

In 2019, respondent, the United States Army Corps of Engineers (USACE or government) awarded a Mississippi River levee construction project to appellant, Phylway Construction, LLC (Phylway). The levee work involved a construction technique called Deep Soil Mixing (DSM) that involved blending a hardening agent with the native soils, *in situ*, to improve the soil, and thus, performance of the levee. Relevant to this appeal, the contract provided that the contractor would not be permitted to perform levee work when the level of the Mississippi River exceeded 11 feet as measured at the Carrolton, Louisiana river gauge. Further, the contract provided that, in the event of high river levels, the contractor would be entitled to an extension of time consistent with Federal Acquisition Regulation (FAR) FAR 52.249-10 Default (Fixed-Price Construction) – a provision that provides for non-compensable time extensions.

In 2019 and 2020, before and during performance of the levee project, the elevation of the Mississippi River exceeded 11 feet on 230 and 171 days, respectively. The number of high water days during this period was roughly two to three times the 1987-2018 average of 80 days per year. During these extended high water periods, Phylway's subcontractor, JAFEC USA, Inc. (JAFEC), was unable to perform the DSM levee work, resulting in a higher cost of performance. The government issued four bilateral contract modifications extending the performance period by over a year (372

days). Phylway requested that JAFEC be permitted to perform certain contract work when the river level exceeded 11 feet, but the USACE declined the requests. In addition, Phylway's requests for equitable adjustment were declined.

Phylway sponsors a pass-through claim by its subcontractor JAFEC, alleging a constructive suspension of work, or that the contract was commercially impracticable. The government moves for summary judgment based on the express terms of the contract assigning the risk to Phylway, and also because Phylway's claims are barred by release and accord and satisfaction, based on the contract modifications extending the period of performance. We grant the government's motion for summary judgment.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

I.      The Contract

The government awarded Contract No. W912P819C0015 to Phylway on February 13, 2019, for $ 48,654,095 (R4, tab 6 at GOV90-93). The contract had a duration of 730 calendar days (*id.* at GOV90). The contract required Phylway to perform work including "clearing and grubbing, disposal of debris material, demolition of existing asphalt and replacing, levee enlargement construction, installation of deep material mixing for ground improvement, construction of levee ramps, surfacing, seeding, fertilizing, mulching, and any other related work" on the Mississippi River levee in Plaquemines Parish, Louisiana (*id.* at GOV343). Deep material mixing, or Deep Soil Mixing is an advanced ground improvement technique through blending a hardening agent with the native soils, *in situ*. (Compl. at ¶ 9). The process is a way to improve the character, strength, and stiffness of the soil. (*Id.*) As a revolver hollow shaft with mixing paddles and/or the mixing tool advance into the soil, the cement grout is pumped through the hollow shaft discharging laterally along the lower mixing paddle where it is mixed with the native soil. (*Id.*; R4, tab 6 at GOV543-47)

The contract's High River Work Restrictions clause provides:

> At such time that the Mississippi River is at or above + 11.0 feet, NAVD 88 (2004.65) at the Carrolton gage (New Orleans District), all construction work shall cease until such time as the elevation subsides below + 11.0 feet. . . . Delays to the Contractor's operations from ceasing work when the Mississippi River elevation is above + 11.0 feet at the Carrolton gage will be subject to the provisions of Section 00700, Contract Clause entitled "Default (Fixed-Price Construction)["] (FAR 52.249-10).

2

(R4, tab 6 at GOV160)

Also relevant to this appeal, the contract includes a clause titled Time Extensions for Unusually Severe Weather, which states in relevant part:

(a) This provision specifies the procedure for determination of time extensions for unusually severe weather in accordance with the Contract Clause in Section 00700, entitled Default (Fixed Price Construction) (FAR 52.249-10). In order for the Contracting Officer to award a time extension under this clause, the following conditions must be satisfied.

(1) The weather experienced at the project site during the contract period must be found to be unusually severe, that is, more severe than the adverse weather anticipated for the project location during any given month.

(2) The unusually severe weather must actually cause a delay to the completion of the project. The delay must be beyond the control and without the fault or negligence of the Contractor.

(a) The following schedule of monthly anticipated adverse weather delays is based on National Oceanic and Atmospheric Administration (NOAA) for temperature, precipitation and wet ground conditions or similar data for the project location and will constitute the base line for monthly weather time evaluations. The Contractor's progress schedule must reflect these anticipated adverse weather delays in all-weather dependent activities. Also considered in the chart below was wind, fog, high or low tides, etc.

. . .

(d) The number of actual adverse weather delay days shall include days impacted by actual adverse weather (even if adverse weather occurred in previous month) and shall be calculated chronologically from the first to the last day of each month and shall be recorded as full days. If the number of actual adverse weather delay

3

days exceeds the number of days anticipated in paragraph b, above, the Contracting Officer will convert any qualifying delays to calendar days, giving full consideration for equivalent fair weather work days, and issue a modification in accordance with the Contract Clause in Section 00700, entitled Default (Fixed Price Construction) (FAR 52.249-10).

(R4, tab 6 at GOV135-36 (Chart omitted))

The default clause referenced in the above contract clause, FAR 52.249-10 Default (Fixed-Price Construction) (APR 1984) is incorporated in full text in the contract (R4, tab 6 at GOV121-22). The default clause provides in relevant part that:

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include—

(i) Acts of God or of the public enemy,
(ii) Acts of the Government in either its sovereign or contractual capacity,
(iii) Acts of another Contractor in the performance of a contract with the Government,
(iv) Fires,
(v) Floods,
(vi) Epidemics,
(vii) Quarantine restrictions,
(viii) Strikes,
(ix) Freight embargoes,
(x) Unusually severe weather, or
(xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers;

(*id.*).

4

Also relevant to the appeal is FAR 52.242-14 Suspension of Work (APR 1984) which is incorporated by reference into the contract (R4, tab 6 at GOV106). The FAR clause provides in relevant part that:

> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

FAR 52.242-14.

During solicitation, and before the award of the contract, potential bidders were able to see all questions posed by potential bidders and government's responses to the questions (R4, tab 3 at GOV11-21). The questions and answers were not incorporated into the contract; however, this information was available to all potential bidders, including Phylway. Relevant to this appeal, on January 25, 2019, an offeror asked whether the Default clause would only grant an extension of time if the Mississippi River was at or above + 11.0 feet, or whether the contractor would be compensated for standby costs during the high river period (*id.* at GOV21). In response, the government indicated that only time would be granted under the Default clause, and that financial compensation would not be available for high river delays (*id.*).

Phylway and JAFEC submitted declarations indicating that they prepared their proposals and executed the contract on the assumption that the Mississippi River would exceed +11.0 feet at the Carrolton gage with approximately the same frequency and duration as it had historically, but that the river level in 2019 and 2020 far exceeded those expectations (app. resp. ex. 4, Declaration of Thomas P. Hymel, dated April 29, 2022 (Hymel Decl.) at ¶ 5; ex. 5, Declaration of Alan R. Ringen, dated April 29, 2022 (Ringen Decl.) at ¶ 6). Phylway did not anticipate the high river levels

when it submitted its proposal (Hymel Decl. ¶ 6), and JAFEC did not understand or intend to assume the risk that the river would exceed +11.0 on historically-anomalous numbers of days during the course of the subcontract when it submitted its proposal or at the time it signed the subcontract (Ringen Decl. ¶ 7). Both Phylway and JAFEC would have included additional costs had they known that the project would include a two-year period where nearly half of it was spent idle (Hymel Decl. ¶ 7; Ringen Decl. ¶ 9).

## II.    *Mississippi River Water Levels*

The High River Work Restrictions clause states that historical readings of Mississippi River gages can be found at www.RiverGages.com (R4, tab 6 at GOV160). From 1987 through 2018, the Mississippi River exceeded an elevation of +11.0 feet at the Carrolton gage an average of 80 days per year (APFF ¶ 24;[1] app. supp. R4, tab 4 at APP92-377). In 2014, the river exceeded +11.0 feet at the Carrolton gage on 15 days (APFF ¶ 25; app. supp. R4, tab 4 at APP333-41). In 2019, the river exceeded +11.0 feet on 230 days (APFF ¶ 26; app. supp. R4, tab 4 at APP377-86). In 2020, the river exceeded +11.0 feet at the Carrolton gage on 171 days (APFF ¶ 27; app. supp. R4, tab 4 at APP386-95).

## III.    *Phylway's Performance of The Contract*

The Notice to Proceed was acknowledged on February 27, 2019 (R4, tab 10 at GOV592). High river delays started February 27, 2019, and lasted until July 31, 2019[2] and another high river season occurred between January 10, 2020, and June 30, 2020.[3] (R4, tabs 13, 21) Despite the contract language, the USACE allowed some work, but not DSM work, to proceed while the Mississippi River exceeded +11.0 feet

---

[1] In its response to the government's motion for summary judgment, appellant indicated that it did not dispute any of the 22 undisputed material facts proposed by the government and submitted its own proposed findings of fact [APFF] ¶¶ 23-53 (app. resp. at 3). In its reply, the government stated that there was no "substantive dispute" between the parties with respect to APFF ¶¶ 23-37 (gov't reply at 2). Accordingly, we accept APFF ¶¶ 23-37 as true for purposes of resolving this motion.

[2] Documents in Rule 4 file give different dates for the end of the high water restriction. *Compare* Rule 4, tab 13 at 609-10 (July 31, 2019) *and* app supp. R4, tab 4 at APP383 (August 12, 2019). Determination of the correct dates is not material to our analysis.

[3] Again, record documents provide alternative dates. *Compare* Rule 4, tab 21 at 630-35 (January 10 to June 30, 2019) *and* app supp. R4, tab 4 at APP386-90 (January 9 to June 27, 2020). Determination of the correct dates is not material to our analysis.

at the Carrolton gage.  (app. resp. ex. 1, Discovery Response (Disc. Resp.) to Interrogatory Nos. 1, 3).

On February 4, 2020, the government issued bilateral Modification No. A00002 (Modification No. 2) (R4, tab 13 at 603).  Modification No. 2 added 156 calendar days to the contract for the time period of February 27, 2019, until December 31, 2019 (*id.* at GOV604).  As part of the bilateral modification, agreed to "due to causes beyond the control and without the fault or negligence of the Contractor, namely adverse weather [delays]" the modification included the following language:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor, its subcontractors and suppliers for all costs and markups directly or indirectly attributable to the change, for all delays, impacts and extended overhead, and for performance of work within the time period of this modification related to unusually severe weather.

(*id.*).  The modification did not include any reservation of cost or claims by Phylway associated with the aforementioned delays.

Modification No. 2 included monthly Weather Data Sheets, with each monthly sheet containing a table with the days of the month as rows, and columns allowing lost work days to be allocated between "weather" defined as "rain, fog, high winds, high/low tides, hail, lightning, high/low temperatures" and "other" defined as "Hurricanes, Tropical Storms, Flooding, High River Water, and Acts of God [strikes or riots]" (R4, tab 13 at GOV605-14).  For each day where the high river level prevented Phylway or its subcontractor from working, the table lists a 100 percent delay in the "other" column and includes "High River CP Soil Borings" in the "Remarks" column (*id.*).  Below the table, the number of "weather" days is summed and reported as "Actual Adverse Weather Delays" which was adjusted by the number of anticipated adverse weather days to determine the number of "Allowable Lost Work Days . . . due to Weather." (*Id.*)  The "Other" delays are summed and reported as "Other Adverse Weather." (*Id.*)  The number of "Allowable Lost Work Days" is then added to the "Other Adverse Weather Total" to generate the "Total Allowable Lost Work Days" which is then converted to calendar days for the contract time extension. (*Id.*)  Thus, the distinction between "weather" and "other" determines whether the delay is due to adverse weather that contractors are to incorporate into the project schedule, such as rain, or unusual weather events, such as high water levels that are not incorporated into the schedule.  The weather data sheets are signed by representatives of the USACE and representatives of the contractor.  Similar Weather Data Sheets accompanied Modification Nos. A00004 (Modification No. 4) (R4, tab 21 at GOV630-

7

35), A00005 (Modification No. 5) (R4, tab 23 at GOV640-43), and A00007 (Modification No. 7) (R4, tab 24 at GOV646-48).

By letter dated May 4, 2020, Phylway notified the government of its intention to submit a request for equitable adjustment (REA) associated with impacts from the shut-down periods in 2019 and 2020 due to the high river elevation (R4, tab 14 at GOV615). By letter dated May 7, 2020, the government denied Phylway's request for financial compensation, noting that the contract provided for only non-compensable time extensions due to high river levels (R4, tab 15 at GOV618). By letter dated May 15, 2020, Phylway requested a waiver for its subcontractor, JAFEC, to resume DSM work when the Carrolton gage elevation receded to + 12.0 feet (R4, tab 16 at GOV619). By letter dated May 18, 2020, the government denied Phylway's requests to resume DSM work when the Carrolton gage receded to + 12.0 feet (R4, tab 17 at GOV621).

The Administrative Contracting Officer (ACO) had the authority to modify the Contract (app. resp. ex. 2, Deposition of Jeffrey Falati, March 16, 2022 (Falati Tr.) at 17, 24-25). The ACO also had the authority to determine whether a particular activity constituted a structural risk to the levee (app. resp. ex. 3, Deposition of Christopher M. Nuccio, March 16, 2022 (Nuccio Tr.) at 27). When Phylway submitted requests to USACE to perform work on the levee when the river exceeded +11.0 feet at the Carrolton gage, the ACO sought recommendations from the project's design engineers (app. resp. ex. 2, Falati Tr. at 17). The design engineers did not have the authority to grant or deny a request for a waiver of the High River Work Restrictions (*id.* at 21). The ACO reviewed and approved or denied all requests for a waiver of the High River Work Restrictions clause on a case-by-case basis (*id.* at 25; app. resp. ex. 1, Disc. Resp. to Interrogatory No. 4). In response to at least one request from Phylway for a waiver to the High River Work Restrictions clause to perform deep soil mixing work, the ACO denied the request because "there is greater risk in allowing potentially hazardous operations above what is allowed in the contract" (R4, tab 17 at GOV621). The ACO did not have an independent understanding of why deep soil mixing constituted a potentially hazardous operation and did not seek any clarification of that determination from the design engineers who made it (app. resp. ex. 2, Falati Tr. at 23-24). The ACO denied Phylway's request because "the levee has been saturated for over four months" (R4, tab 17 at GOV621). The ACO did not rely on any technical definition of the term "saturated" (app. resp. ex. 2, Falati Tr. at 26). There is no standard definition of the term "saturated" (*id.*).

By letter dated June 10, 2020, Phylway notified the government of its intention to submit a request for equitable adjustment for continuous impacts related to extensive high river stoppages (R4, tab 19 at GOV624). By letter dated June 30, 2020, the government again stated its position that no additional compensation was due (R4, tab 20 at GOV627).

8

On September 14, 2020, the government issued bilateral Modification No. 4 for the time period from January 1, 2020, until June 30, 2020 (R4, tab 21 at GOV628). The modification added 173 calendar days to the contract for weather delays (*id.* at GOV629). On January 17, 2021, the government issued bilateral Modification No. 5 for the time period from July 1, 2020, until October 31, 2020 (R4, tab 23 at GOV638). The modification added 35 calendar days to the contract for weather delays (*id.* at GOV639). On February 26, 2021, the government issued bilateral Modification No. 7 for the time period from November 1, 2020, until January 31, 2021 (R4, tab 24 at GOV644). The modification added 8 calendar days to the contract for weather delays (*id.* at GOV645). Modification Nos. 4, 5, and 7 each included the same release language as Modification No. 2, providing that:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor, its subcontractors and suppliers for all costs and markups directly or indirectly attributable to the change, for all delays, impacts and extended overhead, and for performance of work within the time period of this modification related to unusually severe weather.

(R4, tab 21 at GOV629, tab 23 at GOV639, tab 24 at GOV645)

On March 8, 2021, Phylway submitted a request for equitable adjustment for additional costs incurred during the extended shut down flood periods as well as an interruption to slag delivery due to a closure of the Illinois River (R4, tab 25 at GOV649). On March 31, 2021, the government denied Phylway's request for equitable adjustment (R4, tab 26 at GOV699-700).

### IV.    *Phylway's Claim and Appeal*

By letter dated April 5, 2021, Phylway requested a Contracting Officer's Final Decision (R4, tab 27 at GOV701), and on the same day Phylway certified its claim (R4, tab 28 at GOV702). On May 13, 2021, the Contracting Officer issued his Final Decision denying the claim in full (R4, tab 30 at GOV707, 716). The Contracting Officer found that:

> Section 01100, Paragraph 19, HIGH RIVER WORK RESTRICTIONS clause in the contract as well as the DEFAULT (FIXED-PRICE CONSTRUCTION) (FAR 52.249-10) clause are unambiguous that the Contractor is only entitled to time extensions for high water delays. Likewise, the high-water work stoppage criteria were within the purview of the Government's authority to

9

provide for public safety. The criteria are the standard
work requirement imposed for all permitted work, private
or public, that may affect the flood control project. With
regards to demobilization costs, the Contractor declined to
contact the Government, and the Contractor was well
within its rights to demobilize their equipment. Likewise,
FAR 52.242-14, Suspension of Work conditions were not
applicable in the current scenario.

(*id.* at GOV716) On June 24, 2021, Phylway filed a Notice of Appeal with the Board. In its complaint, Phylway specified that it was seeking compensation for delays due to high water levels from February 27, 2019, through August 12, 2019, and from January 9, 2020, through June 27, 2020 (Compl. ¶¶ 67, 80).

On November 2, 2021, the government filed the pending motion for summary judgement. In response, Phylway filed a motion pursuant to Federal Rule of Civil Procedure 56(d) asserting that it was unable to respond to the summary judgment motion without discovery because it required information solely within the possession of the USACE, including the USACE's exercise of discretion to permit or prohibit certain work when the river level exceeded +11.0 feet, and whether the USACE assumed that the river would not exceed +11.0 feet for an extended period during performance of the contact. The Board permitted Phylway to take discovery on these identified issues before it responded to the government's summary judgement motion. (Bd. Order dtd Dec. 21, 2021).

## DECISION

### I.     *Standard Of Review*

We will grant summary judgment only if there is "no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). "A genuine issue of material fact arises when the nonmovant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide

the issue in favor of the nonmovant." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993) (citation omitted).

## II.    *The Express Terms of The Contract Prevent Phylway from Establishing a Constructive Suspension of Work or Commercial Impracticability*

The terms of the firm-fixed-price contract expressly allocated the risk of high river levels to Phylway.  Accordingly, Phylway cannot establish a constructive suspension of work, or that the contact was impracticable.[4]

### A. *The Contract Expressly Allocated the Risk of High River Levels to Phylway*

The contract contains a clause directly applicable to the issues raised in Phylway's claim.  The clause, titled "HIGH RIVER WORK RESTRICTIONS" provides that "[a]t such time that the Mississippi River is at or above + 11.0 feet, NAVD 88 (2004.65) at the Carrolton gage (New Orleans District), all construction work shall cease until such time as the elevation subsides below + 11.0 feet" (R4, tab 6 at GOV160).  The contract clause also provides that "[d]elays to the Contractor's operations from ceasing work when the Mississippi River elevation is above + 11.0 feet at the Carrolton gage will be subject to the provisions of Section 00700, Contract Clause entitled 'Default (Fixed-Price Construction) ['] (FAR 52.249-10)" (*id.*).  The contract clause Time Extensions for Unusually Severe Weather, similarly, provides for an extension of the performance period pursuant to FAR 52.249-10 (R4 tab 6 at GOV135).  The FAR Default (Fixed-Price Construction) clause at 52.249-10 provides that contractors will be entitled to an extension of time but does not provide for compensation.  Phylway cites to no contractual provision entitling it to compensation for delays due to high river levels, and the express terms of the contract clearly, and unambiguously, provide that work must stop during periods of high water, and that the contractor will receive a non-compensable time extension.  Accordingly, we conclude that the firm-fixed-price contract placed the risk of high river levels on the contractor.

### B. *The Contract Was Not Constructively Suspended*

Phylway asserts that it is entitled to compensation because the government constructively suspended work on the contract and maintains that there are material factual disputes preventing the entry of summary judgment in the government's favor (app. resp. at 10-14).  "A constructive suspension has the same effect and consequences as an actual suspension and relief should be granted as if an actual

---

[4] Phylway withdrew Count III of its complaint alleging defective specifications (app. resp. at 10 n.1).

suspension order had been issued." *Merritt-Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 1400 (Ct. Cl. 1976). However, as noted above, the express language of the contract provided that the contractor was to stop work when the river level exceeded 11 feet at the Carrolton gauge (R4, tab 6 at GOV160). The government cannot be at fault for acting within the terms of the contract. *See, e.g., De Matteo Constr. Co. v. United States*, 600 F.2d 1384, 1391 (Ct. Cl. 1979) ("If the contract and regulations which are a part thereof provide for a right to suspend or delay the work for a limited period under particular circumstances, the contracting officer's exercise of such right cannot be deemed unreasonable.") *citing Chaney & James Constr. Co. v. United States*, 421 F.2d 728, 732 (Ct. Cl. 1970).

Phylway alleges that there are factual issues preventing entry of summary judgment because the contracting officer possessed the ability to waive the high river level restriction, and because the contracting officer relied on the advice of his technical specialists in considering Phylway's request to be allowed to resume work with the water level above 11 feet (app. resp. at 11-12). Even assuming the truth of all of Phylway's allegations, as we must in considering a motion for summary judgment, we hold that there was not a constructive suspension of work because the contract expressly stated that work would stop when the river level exceeded 11 feet at the Carrolton gauge. It is undisputed that a warranted contracting officer possesses the authority to modify a government contract. However, that ability, standing alone does not create an issue of fact. Were it otherwise, summary judgment could never be entered in any appeal because the contracting officer always would have had the ability to grant the relief requested by a contractor.

Phylway cites to our decision in *Tkacz Engineering*, ASBCA No. 60358, 18-1 BCA ¶ 36,940, for the proposition there is a mixed question of law and fact preventing entry of summary judgment (app. resp. at 13). However, *Tkacz* is not relevant to the issue in this appeal. In *Tkacz*, the question before the Board was whether the contractor could establish a constructive change where the contract included FAR 52.212-4, CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS (JUN 2010), which includes a changes clause only allowing modifications by written agreement of the parties. *Tkacz*, 18-1 BCA ¶ 36,940 at 179,961-62. The Board found that there was a mixed question of fact and law because the contract terms were "facially vague and their intended application is hotly contested." *Id.* at 179,962. Here, we find the contractual provision requiring to Phylway to stop work when the Mississippi River is higher than 11 feet at the Carrolton gauge to be clear and unambiguous. Phylway asserts that the contract is ambiguous because the government's motion cites to the pre-award questions and answers which are not incorporated into the contract (app. resp. at 13). However, the government's motion cites to the questions and answers primarily to argue that Phylway waived any potential challenge to the high water level restrictions by not bringing a pre-award

12

challenge to the solicitation (gov't mot. at 12-13). To be clear, our interpretation of the contract does not rely upon the pre-award questions and answers.

## C. The Contract Was Not Commercially Impracticable

Phylway asserts that the extended period of high river levels made the contract commercially impracticable (app. resp. at 14-17). To establish commercial impracticability, a contractor must show that "(1) a supervening event made performance impracticable; (2) the non-occurrence of the event was a basic assumption upon which the contract was based; (3) the occurrence of the event was not the contractor's fault; and (4) the contractor did not assume the risk of occurrence." *Spindler Construction Corp.*, ASBCA No. 55007, 06-2 BCA ¶ 33,376 at 165,462 (citing *Seaboard Lumber Company v. United States*, 308 F.3d 1283, 1294-95 (Fed. Cir. 2002)). The doctrine applies where "the costs of performance amount to commercial senselessness. It does not grant relief just because performance cannot be achieved most economically." *Safety Training Systems, Inc.*, ASBCA Nos. 57095, 57166, 14-1 BCA ¶ 35,509 at 174,051 (citing *Natus Corp. v. United States*, 371 F.2d 450, 457 (Ct. Cl. 1967)). Thus "[a] showing of simple economic hardship is not sufficient." *American Combustion, Inc.*, ASBCA No. 43712, 94-3 BCA ¶ 26,961 at 134,243 (citing *Jennie-O Foods, Inc. v. United States*, 580 F.2d 400, 410 (Ct. Cl. 1978)).

Obviously, the high river levels were not Phylway's fault. But, even if we credit Phylway's declarations that it based its bid on the assumption that there would not be extended work stoppages due to high river levels, and that performance of the contract was impracticable, rather than just more expensive, Phylway still fails to meet the test for impracticability, because the contact explicitly placed the risk of delay due to high river level on the contactor (R4, tab 6 at GOV160).

## III. Phylway's Claims Are Also Barred by Accord and Satisfaction

The government argues further that even if Phylway were able to establish a constructive suspension of work, or that the contract was commercially impracticable, that Phylway waived the claims in the releases to the contract modifications that added additional time to the performance period of the contract. To prove the affirmative defense of accord and satisfaction, the government must show four elements: 1) proper subject matter; 2) competent parties; 3) a meeting of the minds of the parties; and 4) consideration. *Holland v. United States*, 621 F.3d 1366, 1382 (Fed. Cir. 2010). As the government notes, Modification Nos. 2, 4, 5, and 7 were bilateral modifications and each of these modifications contained a release providing in relevant part that:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the

Contractor, its subcontractors and suppliers for all costs
and markups directly or indirectly attributable to the
change, for all delays, impacts and extended overhead, and
for performance of work within the time period of this
modification related to unusually severe weather.

(R4, tab 13 at GOV604, tab 21 at GOV629, tab 23 at GOV639, tab 24 at GOV645)
Modification Nos. 2 and 4 cover the period of delay alleged in Phylway's complaint
(Compl. ¶¶ 67, 80; R4, tab 13 at GOV604, tab 21 at GOV629). A bilateral
modification constitutes an accord and satisfaction where the parties agree to a
substituted performance, here an extension of time, in satisfaction of a claim. *See,
e.g., Moore Overseas Const. Co.,* ENGBCA No. PCC-125, 98-1 BCA ¶ 29,682
at 147,029.

Phylway asserts that the release language does not release its claim, because the
release pertains to "unusually severe weather" and not "other" as provided on the
weather summary sheets attached to the modifications (app. resp. at 17-21). However,
Phylway's argument reads just one word from the weather summary sheet in isolation.
While the column header in the weather summary sheet refers to "other" reading the
entire document, it is clear that "other" includes "other weather" as well as non-
weather events that are not subject to offset for "anticipated adverse weather days."
Phylway argues that high river levels are not "weather" because the data are
maintained by the USACE and not the National Oceanographic and Atmospheric
Agency (NOAA) (app. resp. at 20). However, under "other" as examples of "other"
delays, in addition to high river levels, the weather summary sheet also lists
"Hurricanes, Tropical Storms, [and] Flooding" which are clearly "weather" along with
non-weather events such as riots and strikes (R4, tab 13 at GOV605). The weather
summary sheet describes the sum of the "other" column as "Other Adverse Weather
Total" (*id.*).

The modifications provide that the extension of time is being agreed to "due to
causes beyond the control and without the fault or negligence of the Contractor,
namely adverse weather [delays]" (R4, tab 13 at GOV604, tab 21 at GOV629, tab 23
at GOV639, tab 24 at GOV645). These "adverse weather [delays]" addressed in the
modification were high river levels, as evidenced by the "remarks" column in the
weather data sheets which provided that the delay was due to "High River" (R4, tab 13
at 605-09, tab 21 at GOV630-35). This is the same cause of delay that was the subject
of the release signed by Phylway in the bilateral modification. Phylway's claim is for
delays due to high river levels – the same as the modifications and the same as the
contractual releases providing that Phylway agreed that the modification was
"compensation in full … for all costs and markups directly or indirectly attributable to
the . . . performance of work . . . related to unusually severe weather" (R4, tab 13
at GOV604, tab 21 at GOV629, tab 23 at GOV639, tab 24 at GOV645). Phylway's

14

interpretation of the high river level as not being weather is not supported by the modifications. Accordingly, Phylway's claims are barred by accord and satisfaction.

<u>CONCLUSION</u>

For the reasons stated above, we enter summary judgment in favor of the government and Phylway's appeal is denied in its entirety.

Dated: October 11, 2022

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62961, Appeal of Phylway Construction, LLC, rendered in conformance with the Board's Charter.

Dated: October 11, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals